**UNITED STATES of America,**

v.

**Peter Robert JORDAN and Arthur Lorenzo Gordon, Defendants.**

**No. CRIM. 3:04CR58.**

United States District Court,
E.D. Virginia,
Richmond Division.

Jan. 28, 2005.

Order Denying Reconsideration
Feb. 9, 2005.

---

Roderick C. Young and David John Novak, United States Attorney's Office, Richmond, VA, for Plaintiff.

Cary Breckinbridge Bowen, Bowen Champlin Carr & Rockecharlie, Claire Grimmer Cardwell, Stone & Cardwell PLC, Michael N. Herring, Bricker & Herring PC, Gerald Thomas Zerkin, and Frank W. Dunham, Jr., Office of the Public Defender, Richmond, VA, for Defendants.

## MEMORANDUM OPINION
### (Defendants' Motions
### *In Limine* )

HUDSON, District Judge.

This matter is before the Court on a series of motions *in limine* filed by one or both Defendants. All parties have submitted memoranda of law in support of their respective positions. The Court heard oral argument on January 14, 2005. The pertinent facts affecting the disposition of these various motions are relatively complex and bear considerable recitation for ample understanding.

## I. *Background*

This case stems from the brutal murder of Dwayne Tabon ("Tabon") in Richmond, Virginia on September 14, 2001. The Government contends that, during the consummation of a drug transaction at 1714 Clarkson Road, Apartment F, Tabon was forcibly abducted. He was taken to 5003 Walmsley Boulevard where he was set on fire. Although he was burned over ninety (90%) of his body, Tabon freed himself and went to a neighbor's house to call for help. When Officer Anthony Coates of the Richmond City Police Department ("RPD") arrived at 5000 Walmsley Boulevard at approximately 1:17 AM, the rescue squad was already tending to Tabon. When the officer questioned Tabon, he was uncooperative, stating, "Don't worry about it. I'll take care of it myself." When told by Officer Coates that he was going to die, Tabon stated merely that four unknown black males grabbed him while he was walking from his girlfriend's house and set him on fire. Tabon refused to give any further information and was subsequently taken to the Medical College of Virginia Hospital for treatment. He was hospitalized for ten days before dying on September 24, 2001.

For almost three weeks, the RPD had no suspects and no physical evidence relating to the Tabon Murder.[1] On October 16, 2001, however, at the urging of a friend, Paul Adams ("Adams"), Octavia Brown ("Brown") voluntarily walked into the RPD and admitted her role in the Tabon murder.[2] The entire conversation between Brown and the RPD officers was record-

---

1. A friend of Tabon's, who participated in the drug delivery, told police about the drug sale and the events he witnessed as Tabon was transported to the car. He also identified the building that Tabon entered.

2. Brown stated that she was present at her

ed.[3] Upon entering the interview room where Adams and Brown were seated, Detective Conrad Simms, who had been assigned to the Tabon case, asked Brown, "You're looking to come forward and speak with us on this case?" Immediately upon her affirmative response, Detective Simms next asked her, "If you're needed in court, are you willing to testify in court?" Brown nodded in the affirmative and responded, "As long as you all make sure I get there." For the ensuing twenty (20) minutes, Brown proceeded to extemporaneously tell the officers of her involvement in the Tabon affair. The videotape of the interview demonstrates that, for at least the first twenty (20) minutes, with the exception of a few ministerial questions, Brown volunteered information to the officers about the events leading to the death of Tabon. Approximately twenty minutes into the monologue, her statement became more of a response to questions from Detectives Simms and Fulz.

On December 6, 2001, Brown testified before a federal Grand Jury ("Grand Jury") at the United States District Court for the Eastern District of Virginia, Richmond Division. During her testimony, Brown repeated the allegations made to the RPD in further detail. On October 10, 2002, Brown committed suicide in the lockup of the Richmond City Circuit Court, Manchester Division. On March 2, 2004, the Grand Jury returned a two-count Indictment charging Peter Robert Jordan ("Defendant Jordan") with (1) Conspiracy to Distribute Crack Cocaine and (2) Possession of a Firearm in Furtherance of a Drug Trafficking Crime.

On March 3, 2004, a warrant was issued for the arrest of Defendant Jordan on the charges in the Indictment. On June 16, 2004 at approximately 7:00 PM, Defendant Jordan was apprehended by Deputy United States Marshal Marko Anticev at the home of Cheryl Bressant–Overton ("Bressant–Overton"), 161–15 118th Avenue, Jamaica, New York 11434. Bressant–Overton was summoned to testify before the Grand Jury about her relationship with

apartment, 1714 Clarkson Road, Apartment F, on September 14, 2001, and witnessed all or part of the events that occurred there. According to Brown, Tabon, whom she knew and referred to as "Ken," came to her apartment that night to complete a drug transaction with Arthur Lorenzo Gordon, who she knew as "Ron Green." Brown said that Gordon, Peter Robert Jordan, and a man called "Money" were in her apartment. Brown alleged that she was directed to call Tabon to come to her apartment to help facilitate a transaction between Gordon and Tabon. Tabon called back to ask Brown who was in the apartment. Brown lied to Tabon, telling him that only she and Gordon were there. Brown stated that Gordon then left the residence and returned shortly thereafter with garbage bags and duct tape.

According to Brown, Tabon arrived at Brown's apartment to sell the crack to Gordon. Brown was in one rear bedroom. Jordan and "Money" were in another rear bedroom. Brown heard Gordon and Tabon talking. She then heard "bumping" and "rustling" in the next bedroom. Brown stated that she could hear Gordon, Jordan, and "Money" beating Tabon. In addition, they put garbage bags on him and she "could hear them taping [Tabon] up." Brown alleged that, during the altercation between Tabon and the two defendants, someone placed a call to Jackie Jordan, Peter Jordan's sister, to quickly bring her car to Brown's apartment. According to Brown, the men carried Tabon, threw him in the trunk of the car, and took him to 5003 Walmsley Boulevard where he was set on fire.

3. The first hour of the conversation was recorded by videotape. After the videotape cut off at 10:38:31, a tape recorder captured the remainder of the statement. The actual video recording was attached as Exhibits A and B to the Government's Response in Opposition to Defendants' Joint Motion to Exclude the Testimony of Brown. In addition, a transcript of the entire dialogue that occurred at the RPD was attached as Government's Exhibits C and D.

Defendant Jordan. During her testimony before the Grand Jury on July 6, 2004, Bressant–Overton gave false statements concerning the nature of her relationship with Defendant Jordan. She was ultimately indicted on a two-count Indictment charging her with (1) False Declarations Before a Grand Jury and (2) Obstruction of Justice.[4]

At the close of their session on July 6, 2004, the Grand Jury returned a four-count Superseding Indictment charging Defendant Jordan with: (1) Murder While Engaged in Drug Trafficking; (2) Conspiracy to Use and Carry Firearms; (3) Possession of a Firearm in Furtherance of Drug Trafficking; and (4) Conspiracy to Distribute Crack Cocaine and Heroin. The Superseding Indictment also charged Arthur Lorenzo Gordon ("Defendant Gordon"), an alleged co-conspirator, on the first three counts. In addition, the Superseding Indictment contained a section entitled "Notice of Special Findings." In that section, the Grand Jury made seven (7) special factual findings each implicating a provision of 21 U.S.C. § 848 (" § 848"), the statute under which the Government is seeking the penalty of death.

On September 7, 2004, the Grand Jury returned a Second Superseding Indictment which is the current charging document. The only difference between the July 6, 2004 Superseding Indictment and the Second Superseding Indictment ("the current Indictment") was an additional factual finding in the Notice of Special Findings section. Shortly thereafter, on September 30, 2004, the Government served both Defendant Jordan and Defendant Gordon with a Notice of Intent to Seek a Sentence of Death pursuant to 21 U.S.C. § 848(e)(1)(A), in which the Government listed the specific aggravating factors that it intended to prove in seeking a sentence of death. Defendants were arraigned on the current Indictment, and a trial date was set for February 22, 2005. Defendants have filed the following motions *in limine* to which the Government has responded: Motion to Strike the Notice of Intent to Seek the Death Penalty and Bar the Death Penalty; Motion to Strike Nonstatutory Aggravating Factors with Respect to Defendant Gordon; Joint Motion to Exclude the Grand Jury Testimony and Other "Testimonial Statements" of Octavia Brown; Defendant Jordan's Motion to Exclude Testimony of Cheryl Bressant–Overton; Motion for a Witness List; Motion for Court's Preview of Victim Impact Evidence; Motion for Disclosure of Exculpatory, Impeachment, and Mitigation Evidence and Information; Motion for Disclosure of Inculpatory Statements to Non-law Enforcement Witnesses; and Motion to Require the Government to Divulge Criminal Record Check of Jury Panel in Advance of Trial. A hearing was held on Friday, January 14, 2005.[5] The Court will address the motions in turn.

## II. Legal Analysis

### A. Defendants' Joint Motion to Strike Notice of Intent to Seek Death Penalty and Bar Death Penalty

In this motion, Defendants move the Court to (1) strike the Notice of Intent to

---

4. On October 4, 2004, Bressant–Overton pled guilty to Count One of the Indictment charging her with making False Declarations before a Grand Jury. On January 7, 2005, she was sentenced.

5. By consent of the parties and with Court approval, argument was presented at the hearing on the following four (4) motions:

Motion to Strike Nonstatutory Aggravating Factors with respect to Defendant Gordon; Motion to Exclude the Grand Jury Testimony and Other "Testimonial Statements" of Brown; Motion for a Witness List; and a Motion for Court's Preview of Victim Impact Evidence. All the other motions were rendered moot or submitted by the parties for disposition on their briefs.

Seek the Death Penalty; (2) strike from the Second Superseding Indictment the Notice of Special Findings; and (3) bar the death penalty in this case. Defendants base their challenge on the United States Supreme Court's decision in *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), which held that a sentence enhancement that increased the maximum authorized statutory sentence beyond that covered by the jury's guilty verdict, is the functional equivalent of an element of a greater offense. Defendants argue that *Ring* renders 21 U.S.C. § 848, the charging statute in Count One of the current Indictment, unconstitutional in its current form. Defendants contend that the deficiency cannot be cured simply by the executive or judicial branch adopting a constitutionally sound procedure without offending the separation of powers doctrine.

Defendants argue that when Congress passed § 848, it was operating within the context of then prevailing jurisprudence, enunciated by the Supreme Court in *Walton v. Arizona*, 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990), which treated death eligibility as a sentencing issue, rather than an offense element. Defendants assert that the actual text of § 848 bolsters their claim. In support of their claim, Defendants contend that, in enacting § 848, Congress "distinguished between 'any offense' under § 848, and the procedure for 'subjecting the person to the penalty of death' for that 'offense,' " Congress "abandoned [the] application of the Federal Rules of Evidence" in the sentencing phase of the proceeding, and Congress "substituted for grand jury indictment a notice fashioned by the prosecutor." *See* Def.'s Joint Mot. to Strike the Notice of Intent to Seek the Death Penalty and Bar the Death Penalty at 3–4. This evidences,

in Defendants' view, a clear intent by Congress to create purely a sentencing statute. Thus, according to Defendants, when *Ring* altered the definition of "elements of the offense" in the capital sentencing context, it rendered the statute constitutionally infirm. The heart of Defendants' argument is that Congress, not the executive or the judiciary, has the sole authority to remedy an unconstitutional statute. Moreover, the infirmity is not cured by simply adopting a constitutionally sound procedure. In Defendants' view, such action is purely the prerogative of Congress.

█ While Defendants present a cogent and well-reasoned argument, it is without legal merit. This separation of powers issue was recently resolved by the United States Court of Appeals for the Fourth Circuit in *United States v. Barnette*, No. 02–20, slip op. at 19 (4th Cir. Dec. 6, 2004). In *Barnette*, the Fourth Circuit upheld the constitutionality of the Federal Death Penalty Act, 18 U.S.C. § 3591 et. seq. ("FDPA"), under a similar challenge.[6] In that case, the appellant argued that courts applying the FDPA could not comply with both the statute and the dictates of *Ring*, and that the defect could not be cured by the judiciary or the executive. *See* Appellant's Opening Br. at 62–69, *United States v. Barnette*, No. 02–20, slip op. at 19 (4th Cir. Dec. 6, 2004). In its decision, the Fourth Circuit thoroughly analyzed and rejected appellant's arguments and held that the FDPA was constitutionally sound. *Id.* at 19. In doing so, the Fourth Circuit concluded that the statute was "nothing more nor less than the action of Congress to insure that the procedure in the federal courts in the prosecution of a case involving the application of the death penalty complies with the Constitution." *Id.* at 17. Thus, because § 848 is constitutionally

6. Both parties concede, and this Court agrees, that the relevant portions of § 848 and of the FDPA are indistinguishable for purposes of this motion.

firm, this Court's only charge is to ensure that the Government has complied with the statute in a manner that does not aggrieve Defendants' constitutional rights.

As a threshold matter, there appears to be some conflict in the Fourth Circuit as to whether, under *Ring*, the aggravating factors required for a sentence of death need to be charged in the indictment and passed upon by a Grand Jury. *Compare United States v. Higgs*, 353 F.3d 281, 299 (4th Cir.2003) (holding that an indictment for capital murder must contain at least one aggravating factor) *with United States v. Wills*, 346 F.3d 476, 501 (4th Cir.2003) (noting that *Ring* does not require aggravating factors to be alleged in the indictment). This Court, however, need not resolve the apparent conflict or distinguish either case from the one at bar. In this case, the Government has satisfied whatever Fifth and Sixth Amendment rights Defendants may have with respect to the

sentencing factors by including those statutory intent and aggravating factors that render the Defendants eligible for the death penalty in a Notice of Special Findings contained in the current Indictment. In this section of the current Indictment, the Government outlines with clarity and particularity both the Defendants' conduct and the specific statutory subsection of § 848 that renders such conduct aggravating for purposes of death eligibility.[7] In this Court's view, the form the Government has chosen to present these factors to the Grand Jury, namely the Notice of Special Findings, satisfies the requirements of the Fifth and Sixth Amendments and Rule 7 of the Federal Rules of Criminal Procedure.

Moreover, on September 30, 2004, the Government served each Defendant with a formal Notice of Intent to Seek a Sentence of Death pursuant to 21 U.S.C. § 848(h)(1).[8] The notices, which are es-

---

7. The current Indictment charges in pertinent part that "the defendants PETER ROBERT JORDAN and ARTHUR LORENZO GORDON: (1) were more than 18 years of age at the time of the offense (Title 21, United States Code, Section 848(1)); (2) intentionally killed Dwayne Tabon (Title 21, United States Code, Section 848(n)(1)(A)); (3) intentionally inflicted serious bodily injury that resulted in the death of Dwayne Tabon (Title 21, United States Code, Section 848(n)(1)(B)); (4) intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used on connection with a person, other than one of the participants in the offense, and Dwayne Tabon died as a direct result of the act (Title 21, United States Code, Section 848(n)(1)(C)); (5) intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and Dwayne Tabon died as a direct result of the act (Title 21, United States Code, Section 848(n)(1)(D); (6)) committed the offense described in Count One as consideration for the receipt, or in the expectation of the receipt, of anything of pecuniary value (Title 21, United States Code, Section 848(n)(7)); (7) committed the offense described in Count One after substantial planning and premeditation to cause the death of Dwayne Tabon (Title 21, United States Code, Section 848(n)(8)); and (8) committed the offense described in Count One in an especially heinous, cruel, or depraved manner in that it involved torture and serious physical abuse to Dwayne Tabon (Title 21, United States Code, Section 848(n)(12))."

8. The statute requires that "whenever the Government intends to seek the death penalty for an offense under this section for which one of the sentences provided is death, the attorney for the Government, a reasonable time before trial or acceptance by the court of a plea of guilty, shall sign and file with the court, and serve upon the defendant a notice—(A) that the Government in the event of conviction will seek the sentence of death; and (B) setting forth the aggravating factors enumerated in subsection (n) of this section and any other aggravating factors which the Government will seek to prove as the basis for the death penalty."

sentially identical as to each Defendant, with the exception of differing nonstatutory aggravating factors, contain the intent and statutory aggravating factors set forth in the Notice of Special Findings in the current Indictment, as well as three (3) separate nonstatutory aggravating factors upon which the Government plans to rely in seeking the death penalty. The notices are sufficient to comply with the requirements of § 848(h). Defendants are clearly on notice as to what the Government will seek to prove at the sentencing hearing, should the capital offense progress to that stage.

### B. Motion to Strike Nonstatutory Aggravating Factors with Respect to Defendant Gordon

With respect to the nonstatutory aggravating factors discussed above, Defendant Gordon also challenges the introduction of certain nonstatutory aggravating factors relating to his criminal history.[9]

In his motion, Defendant Gordon argues that his relatively insignificant criminal record, based on mostly driving infractions that occurred while he was a juvenile, is not a proper basis for determining wheth-er he is eligible for the death penalty. While recognizing that these offenses could be characterized as a pattern of criminal activity, Defendant Gordon argues that without these trivial offenses, his record would reflect only two juvenile convictions stemming from one arrest in 1995 and one adult conviction in 2002, involving conduct that is part of the very drug conspiracy that is being charged in the current Indictment. He further argues that his criminal record does not constitute an "aggravating" factor to be given consideration in his sentencing.

The Government contends that Defendant Gordon's criminal record as a whole is relevant to his sentencing. Defendant Gordon's efforts to parse his record and focus on individual convictions does not eliminate the importance of this information collectively in assisting a jury's individualization of the sentence. To be relevant, it "must provide some evidence in support of a statutory or non-statutory aggravating factor alleged by the Government.... [E]ach particular piece of information need not be sufficient, by itself, to prove the alleged aggravation factor be-

---

**9.** Subsection one of the Government's Notice of Intent to Seek a Sentence of Death states:

1. Defendant ARTHUR LORENZO GORDON has engaged in a pattern of criminal activity including, but not limited to, the following:

 a. On or about February 18, 1993, Defendant ARTHUR LORENZO GORDON was adjudicated guilty as a juvenile of operating a motor vehicle while not licensed and reckless driving in the Juvenile and Domestic Relations Court in Richmond, Virginia.

 b. On or about January 13, 1994, Defendant ARTHUR LORENZO GORDON was adjudicated guilty as a juvenile of failure to yield the right of way in the Juvenile and Domestic Relations Court in Richmond, Virginia.

 c. On or about January 20, 1995, Defendant ARTHUR LORENZO GORDON was adjudicated guilty as a juvenile of possession of cocaine and firearms offenses in the Juvenile and Domestic Relations Court in Richmond, Virginia.

 d. On or about April 26, 1995, Defendant ARTHUR LORENZO GORDON was adjudicated guilty as a juvenile of disregarding a stop sign and improper registration in the Juvenile and Domestic Relations Court in Richmond, Virginia.

 e. On or about July 28, 1999, Defendant ARTHUR LORENZO GORDON was convicted of driving on a suspended operator's license in the General District Court in Richmond, Virginia.

 f. On or about December 2, 2002, Defendant ARTHUR LORENZO GORDON pled guilty to distribution of "crack" cocaine in criminal case number 3:02CR312 in the United States District Court for the Eastern District of Virginia.

yond a reasonable doubt." *United States v. Chong,* 98 F.Supp.2d 1110, 1117 (D.Haw. 1999). The admissibility of Defendant Gordon's record should not rest on whether his individual convictions will support a death sentence, but whether his criminal history as a whole will assist a jury in determining his appropriate sentence.

Thus, the introduction of Defendant Gordon's criminal record during the penalty phase of the trial will not, as Defendant Gordon argues, serve as the basis for imposing the death penalty. At sentencing, the jury will be presented with testimony and evidence regarding both aggravating and mitigating circumstances. 21 U.S.C. § 848(j). Once the jury finds, beyond a reasonable doubt, the requisite intent and statutory aggravating factors, it may then consider nonstatutory aggravating factors for which notice has been provided by the Government. 21 U.S.C. §§ 848(j) and (k). Both the statutory and nonstatutory aggravating factors are weighed against the mitigating factors by the jury to determine whether the death penalty is warranted. *Id.* Any information relevant to aggravating factors may be presented by the Government, regardless of its admissibility at trial, as long as its probative value is not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. 21 U.S.C. § 848(j). While Defendant Gordon may argue that his record is not relevant in determining his sentence because it is "relatively insignificant," he fails to recognize that his record alone is not the sole determinant of his fate.

■ In *Zant v. Stephens,* 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983), the Supreme Court explained that statutory aggravating factors serve as the eligibility criteria for imposition of a death sentence, while nonstatutory aggravating factors serve as part of the selection process for determining whether the sentence was appropriate for the defendant.

> [S]tatutory aggravating circumstances play a constitutionally necessary function at the stage of legislative definition: they circumscribe the class of persons eligible for the death penalty. But the Constitution does not require the jury to ignore other possible aggravating factors in the process of selecting, from among that class, those defendants who will actually be sentenced to death. What is important at the selection stage is an individualized determination on the basis of the character of the individual and the circumstances of the crime.

462 U.S. at 878, 103 S.Ct. 2733. Defendant Gordon's record, whether it contains serious or minor offenses, conveys information to the jury about his character and is therefore relevant to the sentence selection process. "The possession of the fullest information possible concerning the defendant's life characteristics" is vitally essential to the selection of a proper sentence. *Williams v. New York,* 337 U.S. 241, 247, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949). Admission of this type of evidence is appropriate "even though ... defendant's prior history of noncapital convictions could not by itself provide sufficient justification for imposing the death sentence." *Zant,* 462 U.S. at 888, 103 S.Ct. 2733.

It is premature at this pre-trial stage for Defendant Gordon to argue that his criminal record could not be characterized as "aggravating." It could conceivably support an argument that Defendant Gordon has a history of disregarding the law, which the jury could either accept or reject. Presumably, his record is offered because the Government is required to give notice to Defendant Gordon of the evidence it intends to present during the sentencing phase. If the jury agrees with

Defendant Gordon and finds that his criminal record is "relatively insignificant," then it could be considered a mitigating circumstance rather than an aggravating one. As the Government aptly notes, Defendant Gordon's arguments apply to the weight this evidence should be given by the jury, rather than its admissibility. Thus, Defendant Gordon's Motion is DENIED, and the Government may present his criminal record during the sentencing phase of trial as a nonstatutory aggravating factor.

### C. *Defendant's Joint Motion in Limine to Exclude Grand Jury Testimony and Other "Testimonial" Statements of Octavia Brown*

Next, both Defendant Gordon and Defendant Jordan challenge *in limine* the admissibility of two statements by Brown, who is now deceased. One of the statements at issue is Brown's testimony on December 6, 2001, before a federal Grand Jury.[10] The other is a statement made to officers of the RPD on October 16, 2001. Defendants' argument is rooted in the Confrontation Clause of the Sixth Amendment of the United States Constitution, as interpreted by the Supreme Court in *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). In *Crawford*, the Court held, in essence, that the constitutionally mandated prerequisites to the admissibility of "testimonial evidence" are the unavailability of a witness and a prior opportunity for cross-examination.

Indeed, both the Government and Defendants agree that the admissibility of Brown's statement turns on the holding in *Crawford*. However, the decision in *Crawford* is of such recent vintage that few courts have had the opportunity to determine the boundaries of its application.

What is clear, however, is that *Crawford* has reordered Confrontation Clause jurisprudence, as the United States Court of Appeals for the Second Circuit recently observed:

> *Crawford* redefines the scope and effect of the Confrontation Clause, substituting a *per se* bar on the admission of out-of-court testimonial statements that were not subject to prior cross-examination for the balancing test that previously delineated the limits of the right to confrontation. The redefinition is premised on the text of the Clause, which states that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. Const. amend. VI.

*United States v. Saget*, 377 F.3d 223, 226 (2nd Cir.2004).

The Court in *Crawford* divides its Sixth Amendment analysis into two categories of out-of-court statements: those that are testimonial and those that are non-testimonial. Testimonial statements implicate the right of cross-examination guaranteed by the Confrontation Clause. Those which are non-testimonial are governed by the Rules of Evidence pertaining to hearsay statements. Because the prerequisites of unavailability and prior opportunity for cross-examination were not met in this case, the Court's resolution of the immediate motion therefore turns on whether Brown's statement is "testimonial." A survey of cases construing the term "testimonial" in the *Crawford* context provides some navigational aid but yields nothing directly analogous to the facts at hand.

Drawing from the text of the Sixth Amendment, the *Crawford* Court limited the scope of its analysis to "witnesses against the accused— in other words,

---

10. The Government concedes that Brown's testimony before the federal Grand Jury is a testimonial statement which, in the absence of an opportunity to cross-examine the declarant, is barred by *Crawford*.

those who 'bear testimony.'" *Crawford,* 124 S.Ct. at 1364. The Court further opined that "'testimony,' in turn, is typically '[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.'" *Id.* The Court then explained that "an accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." *Id.* Unfortunately for trial courts, the Supreme Court did not provide a comprehensive definition of "testimonial." It did, however, provide examples of statements at the core of the term, stating that "it applies at a minimum to prior testimony at a preliminary hearing, before a Grand Jury, or at a formal trial; and to police interrogations." *Id.* at 1374.

In attempting to define the boundaries of "testimonial," the Court offered three formulations of statements encompassed by that term. The first is *"ex parte* in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially." *Id.* at 1364. The second consists of "extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions:" *Id.* Finally, the third is those "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Id.; see also Horton v. Allen,* 370 F.3d 75, 84 (1st Cir.2004); *United States v. Cromer,* 389 F.3d 662, 675 (6th Cir.2004).

In order to apply this analytical framework to the case at hand, it is necessary to carefully examine the circumstances surrounding Brown's statement to the RPD. Apparently, at the urging of Adams, Brown met with two detectives assigned to the Tabon homicide case. At the time, Brown had requested neither immunity nor any type of deal to insulate her from potential criminal liability.

The Court has reviewed the videotape of Brown's interview, which the Government and Defendants characterize quite differently. Critical to the Court's analysis of the interview is a comment that a detective made before Brown began the substantive part of her statement. Detective Conrad Simms asked her, "You're looking to come forward and speak with us on this case?" Brown answered, "Yeah." The detective next inquired, "If you're needed in court, are you willing to testify in court?" Brown answered, "As long as you all make sure I get there." (Tr. of October 16, 2001 Interview, p. 2 at lines 15–19.) For the hour that followed, Brown laid out in detail what she recalled having occurred on September 14, 2001. During the first twenty-five (25) minutes, Brown's statement was essentially extemporaneous with occasional questions being asked by the detectives. Thereafter, the statements made by Brown were directed and focused by questioning from the detectives.

The circumstances of the immediate case do not fall squarely within any of the "core" examples presented in *Crawford.* Since the interview was neither police initiated nor designed to elicit incriminating responses, it may not constitute an interrogation in the technical legal sense. *See Rhode Island v. Innis,* 446 U.S. 291, 300–01, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). The Court in *Crawford,* however, cautioned that they were using the term "interrogation" in its colloquial sense. Again, the Court declined to define "interrogation," but held that a statement, "knowingly given in response to structured police questioning, qualifies under any conceiva-

ble definition." *Crawford*, 124 S.Ct. at 1365 n. 4.

In determining whether a statement is testimonial in nature, reviewing courts have focused on the "third formulation" language used in *Crawford* to identify the "core class of 'testimonial' statements ... '[s]tatements that were made under circumstances which would lead an objective witness to reasonably believe that the statement would be available for use at a trial later.'" *Id.* at 1364. Persuasively, the Second Circuit employed this test in part to distinguish testimonial from non-testimonial statements:

> *Crawford* at least suggests that the determinative factor in determining whether a declarant bears testimony is the declarant's awareness or expectation that his or her statements may later be used at a trial. The opinion lists several formulations of the types of statements that are included in the core class of testimonial statements, such as "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Crawford*, —— U.S. at ——, 124 S.Ct. at 1364 (2004) (internal quota-

tions marks omitted). All of these definitions provide that the statement must be such that the declarant reasonably expects that the statement might be used in future judicial proceedings.

*Saget*, 377 F.3d at 228–29.

The Government argues that Brown's meeting with the RPD did not constitute an interrogation. Brown appeared of her own accord and spoke extemporaneously with minimal prompting from the police, at least during the early stages. In the Government's view, the interview did not involve the production or elicitation of information. Brown was not the focus or target of any investigation. It was, in the Government's opinion, more akin to a casual conversation. This argument is plausible except for one troublesome aspect of the conversation. Irrespective of whether Brown's statement to the RPD was sufficiently structured to constitute an interrogation in the technical sense, the detective's initial question, "If you're needed in court, are you willing to testify in court?" was sufficient to put a reasonable person on notice that her "statement might be used in future judicial proceedings." *Id.* This was further reinforced as the interview progressed.[11]

---

11. At the hearing on Defendants' pre-trial motions, held on January 14, 2005, Detective Simms testified that when he inquired if Brown was willing to testify, she agreed to do so. In addition, at one point during her response to police questioning, Brown identified some of the parties allegedly involved in Tabon's murder from a photo spread. Shortly thereafter, Detective Fulz stated to Brown, "I really know why you came forward, because you knew it wasn't right." To which she responded, "That too." In the same breath, she informed the officer that she was fearful for her life for making these statements to the police. A few minutes later, Brown asked the detectives how long it will be before they start "picking [the perpetrators] up," to which Detective Fulz replied, "We started doing stuff immediately, since we talked to you. We just got to make sure we

gather up all the information we need to start." Toward the end of the interview with Brown present, Adams pressed the detectives regarding their time frame for taking action. Adams testified at the hearing that, upon leaving the interview room prior to Brown making her statements, he waited outside for her. A transcript of the recording, however, indicates that Adams reentered the room towards the end of Brown's statement. Detective Simms answered by telling him, "It would be all to your advantage as far as no one knowing about anything that she said to us, not ever knowing about her coming [forward] to testify or anything." Brown then remarked, "I don't have to testify." Detective Simms responded, "Yeah, eventually you have to, but by that time ... everything would be in order."

Brown's statement to RPD had enough of the indicia of "testimonial evidence" articulated in *Crawford* to trigger Confrontational Clause safeguards. Therefore, it could only be admitted as substantive evidence in the guilt phase of the trial upon proof of unavailability and an adequate prior opportunity for cross-examination. The statement at issue fails to satisfy the latter requirement. Having concluded that the Confrontation Clause bars the admissibility of Brown's statement to the RPD absent cross-examination in the guilt phase, the Court will now turn to the permissible use of such a statement during the penalty phase of the trial.

Again, it appears that no court has specifically addressed this issue. The teachings of *Crawford* are more difficult to apply in the context of the penalty phase because the flow of evidence has not been historically governed by the Federal Rules of Evidence as discussed in Section II(A) and (B) above. 21 U.S.C. § 848(j) provides, in pertinent part, with respect to proof of mitigating and aggravating factors in capital cases, that relevant information may be presented "regardless of its admissibility under the rules governing admission of evidence in criminal trials except that information may be excluded if its probative value is substantially outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury."

In order to fully analyze this application of *Crawford* in this context, this Court notes that a number of bedrock legal principles assist in placing the issue in focus. The Supreme Court has consistently counseled that "the Constitution places special constraints on the procedures used to convict an accused of a capital offense and sentence him to death. The finality of the death penalty requires a 'greater degree of reliability' when it is imposed." *Murray v. Giarratano*, 492 U.S. 1, 8–9, 109 S.Ct.

2765, 106 L.Ed.2d 1 (1989) (internal citations omitted).

To facilitate heightened reliability, the Supreme Court has also urged trial courts *to admit more evidence, not less, on the presence or absence of aggravating and mitigating factors. Gregg v. Georgia,* 428 U.S. 153, 203–04, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) ("We think it desirable for the jury to have as much information before it as possible when it makes the sentencing decision."). The language in *Gregg* appears to widen the boundaries of admissible relevant evidence. But, does this relaxation of rigid adherence to restrictive rules of evidence also suggest a dilution of constitutional safeguards? The task before this Court is to define the interplay between § 848(j) and the scope of the Confrontation Clause as enunciated in *Crawford*.

The Government, in urging the Court to receive Brown's statement into evidence at least during the "selection phase of the penalty proceedings," points to the comments by the United States Court of Appeals for the Fourth Circuit in *United States v. Higgs,* 353 F.3d 281, 324 (4th Cir.2003). The court observed in *Higgs* that "it is far from clear that the Confrontation Clause applies to a capital sentencing proceeding." *Id.* Notably, *Higgs* was decided on December 22, 2003, prior to the Supreme Court's opinion in *Crawford*. The language quoted from the *Higgs* decision above, therefore, is of limited value in a post-*Crawford* analysis.

However, although decided before *Crawford*, the decision of the United States Court of Appeals for the Second Circuit in *United States v. Fell,* 360 F.3d 135 (2d Cir.2004), seems to presage the current tension between § 848(j) and the Confrontation Clause:

Congress has the authority to set forth rules of evidence in federal trials subject

only to the requirement that the rules comport with the Constitution, and it may "modify or set aside any judicially created rules of evidence and procedure that are not required by the Constitution." *Dickerson v. United States,* 530 U.S. 428, 437, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000).

360 F.3d at 145.

The court in *Fell* further commented that 18 U.S.C. § 3593(c) of the FDPA, which is analogous to § 848(j),

does not eliminate this function of the judge as gatekeeper of constitutionally permissible evidence; nor does it alter or "eliminate the constitutional baseline for the admissibility of evidence in a criminal trial." ... To the contrary, under the FDPA Standard, "judges continue their role as evidentiary gatekeepers and[, pursuant to the balancing test set forth in § 3593(c),] retain the discretion to exclude any type of unreliable or prejudicial evidence that might render a trial fundamentally unfair."

*Id.* (internal citations omitted). "The FDPA expressly supplants only the rules of evidence, not constitutional standards." *United States v. Johnson,* 239 F.Supp.2d 924, 946 (N.D.Iowa 2003).

In one of the only reported cases discussing the impact of *Crawford* on § 3593(c) of the FDPA, the United States District Court for the District of Connecticut resolved the issues by applying the teachings of *Fell:*

As *Fell* found, however, nothing in the FDPA prevents a trial court from excluding evidence which would violate the defendants' Sixth Amendment right to confront witnesses against them or Fifth Amendment due process guarantees, or which lacks the indicia of reliability required by the Eighth Amendment. *Fell* is consistent with the Supreme Court's recent decision in *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), which held that "[w]here testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation." *Id.* at 1374. As *Fell* notes, the evidentiary standard in the FDPA is but *one* way of achieving compliance with constitutional mandates; ultimately the Constitution must govern evidentiary decisions.

*United States v. Perez,* No. 3:02CR7, 2004 WL 935260, at *2 n. 2 (D.Conn. Apr.29, 2004).

■ The evidentiary and deliberative process in the penalty phase of a capital case has two facets: eligibility and selection. *See Buchanan v. Angelone,* 522 U.S. 269, 276, 118 S.Ct. 757, 139 L.Ed.2d 702 (1998); *see also Zant v. Stephens,* 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983). As the name implies, the eligibility phase determines which class of defendants are statutorily eligible for the death penalty. *See Zant,* 462 U.S. at 878, 103 S.Ct. 2733. In the selection phase, the jury determines what particular sentence should be imposed on the individual eligible defendant. *Id.* at 879, 103 S.Ct. 2733. From a constitutional perspective, the eligibility phase is the most critical because it is a necessary prerequisite to the jury's consideration of the death penalty. It encompasses the finding of fact that increases the defendant's authorized punishment from life in prison to death. "Accordingly, with the exception of the fact of prior convictions, those intent and aggravating factors which the government intends to rely upon to render a defendant death-eligible under the FDPA are the functional equivalent of elements of the capital offense[ ] and must be charged in the indictment, submitted to the petit jury, and proved beyond a reasonable doubt." *Higgs,* 353 F.3d at 298.

■ In reaching its conclusion in *Higgs,* the Fourth Circuit relied upon the Supreme Court's holdings in *Ring* and *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). In *Apprendi,* the Court held that any fact in a federal prosecution that increases the maximum penalty should be treated as an element of an aggravated offense and must be charged in the indictment and proved to the jury beyond a reasonable doubt. 530 U.S. at 490, 120 S.Ct. 2348. Consistent with the constitutional safeguards identified by the United States Supreme Court, as interpreted by the Fourth Circuit, this Court is of the opinion that with respect to the eligibility phase of the penalty stage of a capital trial, the Confrontation Clause is equally applicable. Therefore, in the absence of an adequate opportunity for prior cross-examination, this Court finds that Brown's statement to RPD is barred at least in the eligibility stage by the dictates of *Crawford.*

Ordinarily, the analysis would end here because typically the penalty phase is a unitary proceeding, encompassing both eligibility and selection. A close examination of the governing statute, however, reveals that the statute does not necessarily mandate a single unitary proceeding. 21 U.S.C. § 848(g) and (i) require the court to "conduct a separate sentencing hearing to determine the punishment imposed." It is important to note that § 848 was enacted before the *Crawford* decision. It is therefore doubtful that Congress, in drafting the statute, could have forecast the scope or impact of *Crawford* on its legislation. Additionally, no court has applied the teachings of *Ring* beyond the statutory factors at issue in the eligibility phase.

In this case, the Government urges the Court to bifurcate the sentencing stage to enable the use of Brown's statement during the selection phase of the proceedings. Unlike the eligibility phase, the selection phase is intended to be less structured and less encumbered by strict adherence to the Rules of Evidence. Evidence which is relevant to the statutory factors underlying the eligibility issue may have no bearing on the nonstatutory factors governing selection for the death penalty. Unless its probative value is substantially outweighed by the danger of unfair prejudice, the jury should "have as much information before it as possible when it makes the sentencing decision." *Gregg v. Georgia,* 428 U.S. 153, 203–04, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). Moreover, as the Court noted in *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976), the jury should "have before it all possible relevant information about the individual defendant whose fate it must determine." *Id.* at 276, 96 S.Ct. 2950; *see also Williams v. New York,* 337 U.S. 241, 247, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949).

Because the rule in *Crawford* is newly fashioned, there are no reported cases addressing the advisability of adopting a bifurcated sentencing procedure in capital cases. Indeed, this Court concedes that it may not be wise in all cases. It is a matter on which the Court should exercise its discretion based on the circumstances at hand. The Court notes that United States District Judge Samuel G. Wilson for the Western District of Virginia recently decided to employ a bifurcated sentencing scheme in *United States v. Simmons,* No. 5:04CR314–01 (W.D.Va.), a capital case.

■ In the immediate case, if the trial proceeds to the penalty phase, the Government intends to offer evidence which, in this Court's view, is inadmissible on the issue of eligibility but permissible in the selection process. Therefore, it is the opinion of this Court that bifurcation is appropriate under the facts of this case. Accordingly, if this case reaches the penalty stage, the proceedings will be divided

between the eligibility and selection phases. If the jury finds, beyond a reasonable doubt, that the Government has proven an intent factor and one of the requisite statutory aggravating factors, they will immediately proceed to hear evidence on the non-statutory factors. At that point, the jury will have concluded that the Government has proven all facts deemed by *Ring* to be the equivalent of elements essential to death penalty eligibility.

The final question then is, which of Brown's statements should be admitted in the selection phase and in what form.[12] Without the *Crawford* limitations, this portion of the proceeding reverts to the pre-*Crawford* evidentiary standard articulated in 21 U.S.C. § 848(j). Therefore, the Court should admit all relevant evidence as long as its probative value is not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, "regardless of its admissibility under the rules governing admission of evidence at criminal trials." 21 U.S.C. § 848(j). Clearly, Brown's statements are relevant and probative as they pertain directly to the events surrounding the murder of Dwayne Tabon. But is their probative value substantially outweighed by the danger of unfair prejudice?

■ Prior to *Crawford*, Brown's testimony before the Grand Jury would have been admissible even during the guilt stage of the trial, given her undisputed unavailability, provided that it satisfied the test of reliability. *United States v. McHan,* 101 F.3d 1027, 1037–38 (4th Cir.1996). This Court has not reviewed Brown's Grand Jury testimony in its entirety. If the Government can demonstrate from the totality of the circumstances that the statement has particularized guarantees of trustworthiness

and the requisite indicia of reliability, the Court will allow its introduction in the selection stage of the penalty phase.

Brown's statement to the RPD is a closer question. While the statement was not under oath, it was clearly self-incriminating and was offered voluntarily and without apparent expectation of legal benefit. The first twenty-five (25) minutes of the statement, which appears to be all the Government intends to offer into evidence, was virtually a monologue with minimal police prompting. Therefore, the statement in general has adequate particularized guarantees of trustworthiness. While admittedly not a critical part of the analysis, trustworthiness should be accorded some weight in the Court's assessment of the statement's probative value. Also bearing directly on that evaluation is the fact that the declarant was an eyewitness to much of what she recounted.

On initial review of Brown's statement, this Court is of the opinion that the danger of unfair prejudice does not substantially outweigh the statement's probative value. However, the Court will leave the door ajar for Defendants to direct the Court's attention to any portion of the statement which they believe poses an unfair danger of prejudice, particularly with respect to events not personally heard or seen by the declarant.

Because Brown's statement is not being offered to prove the guilt of the accused, or any enhancing element of punishment, redaction of statements of accomplices is not constitutionally required. *See Lilly v. Virginia,* 527 U.S. 116, 138, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999). Again, however, if Defendants can demonstrate that any specific portions of the statement are un-

---

12. Unlike the guilt phase or the eligibility stage of the sentencing process, the Government suggests that Brown's Grand Jury testimony should be admitted under the more relaxed evidentiary rules governing the selection stage.

duly prejudicial, this remedial tool remains available to them.

D. *Defendant Jordan's Motion to Exclude Testimony of Cheryl Bressant–Overton*

Defendant Jordan next contends that the Grand Jury testimony of Cheryl Bressant–Overton is the product of Grand Jury abuse by the Government and, therefore, should be excluded from use at trial. The Court begins its analysis by noting that a survey of reported decisions reveals none where such relief has been granted. Preliminarily, this Court has serious doubts that Defendant Jordan has standing to challenge the use of a Grand Jury to elicit the testimony of a third party witness.[13] Nevertheless, the Court will assess the merits of Defendant Jordan's motion.

Defendant Jordan was originally indicted by the Grand Jury on March 2, 2004. The original indictment contained two counts: (1) Conspiracy to Distribute Crack Cocaine, and (2) Possession of a Firearm in Furtherance of Drug Trafficking. On July 6, 2004, the Government secured a Superceding Indictment from the Grand Jury. The Superceding Indictment contained four counts: (1) Murder While Engaged in Drug Trafficking; (2) Conspiracy to Use and Carry Firearms; (3) Possession of a Firearm in Furtherance of Drug Trafficking; and (4) Conspiracy to Distribute Crack Cocaine and Heroin. Both Defendant Gordon and Defendant Jordan were charged in Counts One, Two, and Three. Count Four charged only Defendant Jordan with conspiring to traffic in crack cocaine and heroin. The testimony of Bressant–Overton at issue, occurred on July 6, 2004, prior to the Grand Jury's return of the Superceding Indictment.

Defendant Jordan contends that the Government abused the Grand Jury process in two respects. First, Defendant Jordan believes that Bressant–Overton's testimony did not aid the Grand Jury in its quest for information bearing on the decision to indict. Second, and clearly allied with the first contention, Defendant Jordan asserts that probable cause already existed to indict him on the murder charge at the time Bressant–Overton's testimony was presented to the Grand Jury. In support of his second challenge, Defendant Jordan points out that a state magistrate had earlier issued a warrant for his arrest for the murder of Dwayne Tabon. Therefore, in Defendant Jordan's view, the Government had sufficient evidence to satisfy the probable cause requirement.

 Both of these arguments flow from a faulty premise. Bressant–Overton's testimony was heard by the Grand Jury before the Superceding Indictment was returned. In other words, her testimony was presented before the Grand Jury voted on the Bill of Indictment. This vote, as a matter of law, is the point at which probable cause is formally found. Prior to the vote, it is impossible to determine when, if at all, the Grand Jury was satisfied that the evidence warranted Defendant Jordan's indictment for murder. Moreover, even if the Grand Jury theoretically had sufficient evidence to indict Defendant Jordan for murder, it need not cease its investigation at that point. "A grand jury investigation 'is not fully car-

---

**13.** In *United States v. Williams*, 504 U.S. 36, 112 S.Ct. 1735, 118 L.Ed.2d 352 (1992), the United States Supreme Court noted that a grand jury should be " 'free to pursue its investigations unhindered by external influence or supervision so long as it does not trench upon the legitimate rights of any witness called before it.' *United States v. Dioni-* *sio,* 410 U.S. 1, 17–18, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973)." 504 U.S. at 49, 112 S.Ct. 1735. The United States Supreme Court has historically been reluctant to permit defendants to invoke the constitutional rights of third parties before the grand jury. *See United States v. Payner,* 447 U.S. 727, 736, 100 S.Ct. 2439, 65 L.Ed.2d 468 (1980).

ried out until every available clue has been run down and all witnesses examined in every proper way to find if a crime has been committed.'" *Branzburg v. Hayes,* 408 U.S. 665, 701, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972); *see also United States v. R. Enterprises, Inc.,* 498 U.S. 292, 297, 111 S.Ct. 722, 112 L.Ed.2d 795 (1991).

The fact that a Richmond City magistrate found sufficient probable cause to justify issuance of a criminal warrant charging Defendant Jordan with murder adds little to the analysis. The Richmond City magistrate is a separate sovereign whose findings carry little weight outside of that particular jurisdiction. The federal Grand Jury is an independent body—detached as a matter of law from both the court and prosecution—which exercises its own judgment in determining which cases merit trial in United States District Court. *See R. Enterprises, Inc.,* 498 U.S. at 297, 111 S.Ct. 722. Simply put, in the context of a federal Grand Jury, the opinion of a state court magistrate as to probable cause has no more force and effect than that of any other citizen.

Based on the record at hand, this Court is of the opinion that the Government's presentation of the testimony of Bressant–Overton before the Grand Jury on July 6, 2004, was not an abuse of the grand jury process. The content of her testimony was directly relevant to the issues before the Grand Jury. Therefore, Defendant Jordan's Motion to Exclude the Testimony is DENIED.

III. *Miscellaneous Pre–Trial Defense Motions*

Lastly, the defense filed several other pre-trial motions which were either resolved by agreement or ruled upon in open court. The Defendants' joint Motion for a Witness List was resolved by agreement of counsel. The Defendants' joint Motion for Court's Preview of Victim Impact Evidence will be DENIED for the reasons stated in open court. There is no statutory requirement that the Court conduct such a preview. Moreover, the Government has indicated that it will not introduce any personal opinion victim impact evidence commenting on the nature of the crime, the defendants, or the appropriate sentence in this case.

Defendant Jordan's Motion to Require the Government to Divulge Criminal Record Check of Jury Panel in Advance of Trial is MOOT. The Government has represented that it will not conduct any such record check. Defendants' Motion for Disclosure of Exculpatory, Impeachment and Mitigation Evidence and Information is self-executing. Defendants' motion puts the Government on notice that certain materials and information in their possession may be exculpatory. The Government, therefore, has the burden to determine whether or not such information is disclosable under *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). If so, it has a duty to disclose such information or material, and agrees to do so.

Defendants' Motion for Disclosure of Inculpatory Statements to Non-law Enforcement Witnesses is DENIED. The Government indicated in open court that any statements to non-law enforcement officers will be declarations made in furtherance of the conspiracy charged in the Indictment. The Government does not intend to introduce statements of one defendant potentially incriminating the other, implicating the rule announced in *Bruton v. United States,* 391 U.S. 123, 137, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). If necessary, the Government has indicated its willingness to redact any statements to non-law enforcement officers in order to avoid severance if *Bruton* issues emerge.

An appropriate Order will accompany this Memorandum Opinion.

**Government's Motion for Reconsideration or, Alternatively, Motion for Continuance**

On January 28, 2005, this Court issued a Memorandum Opinion granting in part and denying in part Defendants' Joint Motion *in Limine* to Exclude Grand Jury Testimony and Other "Testimonial" Statements of Octavia Brown. On January 31, 2005, the Government filed a Motion for Reconsideration or, Alternatively, Motion for Continuance. Defendants jointly filed their Memorandum in Opposition on February 2, 2005, and this Court heard oral argument on February 3, 2005.

In its motion, the Government moves the Court to reconsider that portion of its ruling, excluding from the guilt phase of the trial, Octavia Brown's ("Brown") statement to the Richmond City Police Department ("RPD"). The Court concluded in its Memorandum Opinion that Brown's statement to the RPD was testimonial in nature and, therefore, was barred under *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), from use as evidence during the guilt phase of the trial. The Government now suggests that the Court may have "inadvertently erred" by failing to address "whether a statement found to be 'testimonial' under *Crawford*" may be redacted to comply with *Richardson v. Marsh*, 481 U.S. 200, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987), and *Gray v. Maryland*, 523 U.S. 185, 118 S.Ct. 1151, 140 L.Ed.2d 294 (1998), and satisfy the Confrontation Clause of the Sixth Amendment. (Gov't Mot. for Reconsideration, p. 2.)

The Court concedes that this issue was raised by the Government in response to Defendants' Joint Motion to Exclude Grand Jury Testimony and Other "Testimonial" Statements of Octavia Brown. Unfortunately, the issue was not fully developed in the Government's supporting memorandum of law, and consequently, the Court concluded that it was a secondary argument subsumed by the Government's position that Brown's statement was not testimonial in nature. Because the declarant, in this case, was not a "co-defendant, who stands accused side-by-side with the defendant," *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), this Court did not believe, based upon clear Fourth Circuit precedent, that the *Bruton* line of cases was applicable or relevant to the analysis. *See United States v. Workman*, 860 F.2d 140, 143 (4th Cir.1988) (declining to extend *Bruton* application to statement of a declarant who died and was not a co-defendant at trial); *see also United States v. Morsley*, 64 F.3d 907, 918 (4th Cir.1995) (declining to extend *Bruton* application to statement of a declarant who was not a co-defendant.).

The Government's motion for reconsideration places the issue in much sharper focus and presents a slight variant on its initial position. The Government contends that even though Brown's statement may be found to be testimonial under *Crawford*, it may be redacted to satisfy Defendants' Sixth Amendment right of confrontation. The Government maintains that, in redacted form, Brown's statement neither implicates the Sixth Amendment nor triggers a right of confrontation.

The initial task before the Court is to identify what statements are encompassed by the Sixth Amendment right of confrontation. In staking out the boundaries of the Confrontation Clause, the Court in *Crawford* relied heavily on the text of the Clause itself. "It applies to 'witnesses' against the accused— in other words, those who 'bear testimony.'" *Crawford*, 124 S.Ct. at 1364. The Government argues that Brown's statement can be redacted to the extent that it is neither directly accusatory nor facially incriminatory. In this neutralized form, Brown's

statement would not bear witness against the specific named Defendants in this case. In the Government's view, such redaction would eliminate any Confrontation Clause barrier to its admissibility in the guilt phase of the trial.

The Government contends that courts reviewing the effect of *Crawford* on statements sanitized by redaction, appear to find the protections of *Crawford* coextensive with those articulated in *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), and its progeny. *See Richardson v. Marsh*, 481 U.S. 200, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987); *Gray v. Maryland*, 523 U.S. 185, 118 S.Ct. 1151, 140 L.Ed.2d 294 (1998). The Government states that "[t]here appears to be no reason or legal authority holding that redactions cannot be used to cure a *Crawford* defect in the same way that redactions are used to address other Confrontation Clause issues. Indeed, all of the courts that have addressed this issue have ruled that redactions can be used to obviate any *Crawford* concerns." (Gov't Mot. for Reconsideration, p. 2.) This legal proposition is plausible in the abstract. Its application to the instant case, however, is based upon a faulty premise—that the *Bruton* protections can be utilized in a context outside of the factual boundaries from which they have their genesis. That said, it is necessary to closely examine the factual landscape from which *Bruton* problems have arisen.

In *Bruton*, the Supreme Court held that the Confrontation Clause of the Sixth Amendment "prevents the introduction of a co-defendant's confession, which incrimi-nates the defendant, at a joint trial when the co-defendant does not take the witness stand so that he may be cross-examined." *United States v. Workman*, 860 F.2d 140, 143 (4th. Cir.1988). In *Richardson v. Marsh*, 481 U.S. 200, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987), the Court limited the effect of *Bruton* by holding that a redaction of a co-defendant's confession to eliminate any references to the defendant combined with a limiting instruction satisfied the Confrontation Clause. *See United States v. Locklear*, 24 F.3d 641, 646 (4th Cir.1994). The Court, however, concluded in *Gray v. Maryland*, 523 U.S. 185, 192, 118 S.Ct. 1151, 140 L.Ed.2d 294 (1998), that "if a redacted confession of a non-testifying codefendant given to the jury ... shows signs of alteration such that it is clear that a particular defendant is implicated, the Sixth Amendment has been violated." *United States v. Akinkoye*, 185 F.3d 192, 197 (4th Cir.1999).

What is clear from longstanding Fourth Circuit jurisprudence, interpreting this line of cases, is that the redaction remedy has only been accepted when (1) several co-defendants are tried jointly; (2) one defendant's extrajudicial statement is used to implicate another defendant in the crime; and (3) the confessor does not take the stand and is thus not subject to cross-examination. *See, e.g., United States v. Safley*, 408 F.2d 603 (4th Cir.1969); *Workman*, 860 F.2d at 143–44; *Morsley*, 64 F.3d at 918; *Locklear*, 24 F.3d at 646; *Akinkoye*, 185 F.3d at 197. Other circuits confronting this issue have uniformly adopted a similar construction of the *Bruton* line of cases.[1] On this point, the Cir-

---

1. *See, e.g., United States v. Barnett*, 989 F.2d 546, 558–59 (1st Cir.1993); *United States v. Albert*, 773 F.2d 386, 388 (1st Cir.1985); *United States v. Kyles*, 40 F.3d 519, 526 (2d Cir.1994); *United States v. Danzey*, 594 F.2d 905, 917 n. 12 (2d Cir.1979); *United States v. DePeri*, 778 F.2d 963, 982 n. 6 (3rd Cir.1985); *United States v. Jobe*, 101 F.3d 1046, 1066

(5th Cir.1996); *Stanford v. Parker*, 266 F.3d 442, 456 (6th Cir.2001); *Pettyjohn v. Newberry*, 225 F.3d 659, 2000 WL 1033027, *4 (6th Cir.2000) (unpublished); *Neuman v. Rivers*, 125 F.3d 315, 319 (6th Cir.1997); *United States v. Jones*, 371 F.3d 363, 368–369 (7th Cir.2004); *United States v. Chapman*, 345

cuits are consistent because the Supreme Court's language in *Bruton, Richardson,* and *Gray* itself mandates the requirements. *See Bruton,* 391 U.S. at 135, 88 S.Ct. 1620 ("Such a context is presented here, where the powerfully incriminating extrajudicial statements of a codefendant, who stands side-by-side with the defendant, are deliberately spread before the jury at a joint trial."); *Richardson,* 481 U.S. at 201–02, 107 S.Ct. 1702 ("In *Bruton* ... we held that a defendant is deprived of his rights under the Confrontation Clause when his nontestifying codefendant's confession naming him as a participant in the crime is introduced at their joint trial .... Today we consider whether *Bruton* requires the same result when the codefendant's confession is redacted."); *Gray,* 523 U.S. at 188, 192, 118 S.Ct. 1151 ("*Bruton* involved two defendants accused of participating in the same crime and tried jointly .... Originally, the codefendant's confession in the case before us, like that in *Bruton,* referred to, and directly implicated, another defendant.").

The Government suggests that "all of the courts that have addressed this issue have ruled that redactions can be used to obviate any *Crawford* concerns." In support of this proposition, the Government cites six (6) cases from various jurisdictions.[2] Upon close examination, each of these cases is factually distinguishable from the one before this Court. All of the cases cited by the Government, although

interpretive of *Crawford,* involve proposed redactions to cure *Bruton* problems—those that center around the admissibility of a non-testifying co-defendant's statement offered during a joint trial.[3]

In fact, a thorough review of the case law in every federal circuit reveals only one case, *United States v. Jones,* 371 F.3d 363, 368–69 (7th Cir.2004), addressing the specific application of *Richardson* in a post-*Crawford* legal environment. In that case, relying on a pre-*Crawford* Eighth Circuit case, *United States v. Chapman,* 345 F.3d 630 (8th Cir.2003), the Seventh Circuit distinguished the *Bruton* line of cases from the situation, as here, which involves the confession of a third-party declarant who was not a co-defendant in the trial. The Seventh Circuit concluded that absent the essential elements of *Bruton,* the redaction remedy was inapplicable and the admissibility of the third-party hearsay statement was governed by *Crawford.*

The analysis of the Seventh Circuit is particularly instructive in this case as it mirrors the holding of the Fourth Circuit in *United States v. Workman,* 860 F.2d at 143. Faced with facts virtually identical to the ones in the case before this Court, the Fourth Circuit, in *Workman,* declined to extend *Bruton.* In *Workman,* the declarant was an integral part of a conspiracy to ship stolen goods and chattels in interstate commerce. The declarant pled guilty and

---

F.3d 630, 634 (8th Cir.2003); *United States v. Sanders,* 133 F.3d 930, 1997 WL 812245, *1 (9th Cir.1997) (unpublished); *United States v. Sarracino,* 340 F.3d 1148, 1159–61 (10th Cir. 2003); *Johnson v. Gibson,* 229 F.3d 1163, 2000 WL 1158335 at *7 (10th Cir.2000) (unpublished); *United States v. Thayer,* 204 F.3d 1352, 1355 (11th Cir.2000); *United States v. Burroughs,* 935 F.2d 292, 294 (D.C.Cir.1991).

**2.** *United States v. Simpson,* 116 Fed. Appx. 736, 2004 WL 2912807 at *5 (6th Cir.2004) (unpublished); *United States v. Damti,* 109

Fed. Appx. 454, 2004 WL 2029953 at *2 (unpublished summary order); *Concepcion v. United States,* 328 F.Supp.2d 372, 374 (E.D.N.Y.2004); *United States v. Le,* 316 F.Supp.2d 330, 338 (E.D.Va.2004); *United States v. Chen,* 393 F.3d 139 (2d Cir.2004);

**3.** The immediate case involves application of *Crawford* in a different context to that in the cases cited by the government. The Court, therefore, need not address the effect of *Crawford* on the redaction remedy in the *Bruton* context.

agreed to assist the government. Shortly before trial, the declarant died. His extra-judicial statements to the FBI were offered at the trial of the other defendants, to which they objected. The Fourth Circuit limited the prescript of *Bruton* stating that, "*Bruton* prevents the introduction of a co-defendant's confession, which incriminates the defendant, at a joint trial when the co-defendant does not take the witness stand so that he may be cross-examined." *Workman,* 860 F.2d at 143. The Court held, in that case, that "[w]e are not faced with a *Bruton* issue." *Id.* at 144. The Court concluded that it was faced with a "hearsay issue" because the declarant "died before trial, and at the time of the trial he was not a co-defendant." *Id.* The Court, much like the Seventh Circuit in *Jones,* analyzed the admissibility of the hearsay statement under then existing precedent, *Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980).

This Court is bound to apply existing Fourth Circuit precedent to the cases before it. In this Court's view, *Workman* is dispositive of the issues presented here.[4] Although *Workman* was decided well before *Crawford,* the Fourth Circuit's analysis is relevant and instructive. While *Crawford* reordered Confrontation Clause jurisprudence, it did nothing to alter the application of *Richardson* redactions outside of the *Bruton* context. The Government contends that a testimonial statement, inadmissible under *Crawford,* can be redacted to satisfy the Confrontation Clause. Clearly, the strong language adopted by Justice Scalia in *Crawford* suggests a more restrictive approach. "[The Confrontation Clause] commands, not that the evidence be reliable, but that the relia-

bility be assessed in a particular manner: by testing in the crucible of cross-examination." *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 1370, 158 L.Ed.2d 177 (2004). Indeed, the "unpardonable vice" of the *Ohio v. Roberts* test that led to its demise in *Crawford* was "its demonstrated capacity to admit core testimonial statements that the Confrontation Clause plainly meant to exclude." *Id.* at 1371.

In this case, Brown's statement is one that the Confrontation Clause plainly meant to exclude. "The *Bruton* line of cases deals with situations in which the confession of one defendant is offered at a joint trial where the statement is redacted to omit any explicit reference to the co-defendant and the jury is instructed to consider the statement only against the *declarant.*" *United States v. Jones,* 371 F.3d 363, 368–69 (7th Cir.2004); *see also Workman,* 860 F.2d at 143. The judicial remedy of redaction was fashioned to fulfill a specific purpose, namely to balance a defendant's Confrontation Clause rights with the judicial interest in trying co-defendants jointly. The Sixth Amendment poses no barrier to the admissibility of a confession against the defendant who made the incriminating statement, when redaction, coupled with a limiting instruction from the court, protects the Confrontation Clause rights of a co-defendant at a joint trial. That is not the case here.

This Court can find no distinction between the facts in *Workman* that led the Fourth Circuit to reject the application of *Bruton,* an application the Government now advances, and the facts in the case at hand. Since Brown has not been charged with a crime and will obviously not be

---

4. Neither party, in their memoranda, cites *Workman.* Thus, the Government has not suggested that *Workman* was wrongly decided or should be overturned. The *Workman* disposition has been cited with approval by the Fourth Circuit repeatedly. *See, e.g., United States v. Ellis,* 951 F.2d 580 (4th Cir.1991); *United States v. McHan,* 101 F.3d 1027 (4th Cir.1996).

present at the trial, her statement is apparently intended for use against the only two remaining defendants, Defendant Jordan and Defendant Gordon.

 The Supreme Court has repeatedly stated that statements of non-testifying accomplices, like Brown's, that implicate defendants are presumptively unreliable and their admission violates the Confrontation Clause. *See Douglas v. Alabama,* 380 U.S. 415, 419, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965); *Bruton,* 391 U.S. at 126, 88 S.Ct. 1620; *Lee v. Illinois,* 476 U.S. 530, 541, 106 S.Ct. 2056, 90 L.Ed.2d 514 (1986). In *Crawford,* the Supreme Court made clear that the only way to assure reliability of such statements is through the crucible of cross-examination. *Crawford,* 541 U.S. 36, 124 S.Ct. 1354. Thus, the redaction remedy adopted in *Richardson* is inapplicable to Brown's statement, and its admissibility must be analyzed utilizing the *Crawford* standard that replaced the rule articulated in *Ohio v. Roberts.* The Court is unpersuaded that its original impressions were incorrect. In this Court's view, Brown's statement was testimonial and is inadmissible during the guilt phase of trial.

In the final analysis, this Court acknowledges that *Crawford* is of such recent vintage that the specific issue raised by the Government has only been addressed by the Seventh Circuit. However, it appears that no court in the United States has adopted the theory advanced by the Government. In fact, the Fourth Circuit, among others, has specifically rejected the theory in a comparable factual situation. Thus, for this Court to adopt the Government's position would be a clear break from existing precedent in this Circuit and every other circuit in the United States. This Court declines to do so. Accordingly, the Government's Motion for Reconsideration is DENIED, and for the reasons stated in open Court on February 3, 2005, the Government's Motion for Continuance is GRANTED.

An appropriate Order will accompany this Memorandum Opinion.