NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 04a0157n.06
Filed: December 15, 2004

Nos. 03-5409/5429/5629

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| GEORGE HUBERT SIMPSON, VANCE | ) | EASTERN DISTRICT OF TENNESSEE |
| BOWERS, and ALLEN MARK AJAN, | ) | |
| | ) | |
| Defendants-Appellants. | ) | |

Before: SUTTON and COOK, Circuit Judges; ALDRICH, District Judge.[*]

SUTTON, Circuit Judge. This case began with a drug trafficking conspiracy, which led to the armed collection of a drug debt, and ended with a brief kidnapping. After reviewing the numerous issues raised by the three defendants on appeal, we affirm.

I.

On November 26, 2000, Officer Eric Alford of the Kingsport Police Department (located in Tennessee) arrested Allen Ajan for drunken driving. When an inventory search of Ajan's car revealed items commonly used in drug sales—a bag of white powder (later determined to contain

_____

[*] The Honorable Ann Aldrich, United States District Judge for the Northern District of Ohio, sitting by designation.

methamphetamine), reclosable plastic bags, a digital scale and a cell phone—Officer Alford used the redial function on Ajan's cell phone to determine whom Ajan had last contacted. George Simpson answered the call, and Alford (without identifying himself) told Simpson that Ajan had passed out and that he feared the police would arrest both Ajan and him. When Alford asked Simpson what he should do, Simpson replied, "Bring him to me, he's my boss," and directed Alford to bring Ajan to a local Coastal Mart so that Simpson could pick him up. JA 485. Alford reported the contact to Officer Mike Hickman, who proceeded to the Coastal Mart to meet Simpson.

Arriving at the Coastal Mart at 10:00 p.m., Officer Hickman observed two men dressed in camouflage entering the store. Noting that they also wore bullet-resistant vests and that they carried two-way radios and a pair of binoculars, Hickman asked the men to identify themselves. According to Hickman, one of the men identified himself as Simpson; the other identified himself as Vance Bowers. Both men consented to pat-down searches, which revealed that Simpson was carrying a loaded .38 revolver. The police later searched Simpson's house, finding several other weapons but no drugs.

Two weeks later, on December 8, 2000, Ajan, Simpson, and Bowers found White at the West Side Inn in Kingsport, where White had rented a room for the night. When White answered their knock on the door, Ajan followed Bowers into the room and struck White on the head with the walkie-talkie he was carrying. Displaying a pistol, Ajan demanded $150 of White, presumably for the "eight ball" (slang for an eighth of an ounce) of methamphetamine that Ajan had given White several days earlier. Two of White's friends, Curtis McDavid and Ricky Howe, then arrived at the

hotel room.  Seeing Ajan, Simpson and Bowers there, McDavid and Howe assumed they had the

wrong room, but Ajan ordered them to stay and, reinforcing the point, ordered Simpson to pull out

the "Tec 9" handgun he was carrying.  With Simpson blocking one of the room's exits with a chair,

Ajan told White, McDavid and Howe to empty their pockets, which they did.

After taking all of their money, Ajan forced White to call his mother, Loretta Wogomon, to

ask her for $300.  When Wogomon thought her son was joking, Ajan took the phone and said,

"Ma'am, this is not a joke. . . .  You better bring me $300 or I'm going to blow your son's mother

f—ing head off."  JA 731.  After the phone call, Ajan, Simpson and Bowers herded the three men

into a white Toyota to meet Wogomon; Ajan and Bowers rode with the three hostages while

Simpson followed separately in a red Cavalier and maintained contact with Ajan by walkie-talkie.

Wogomon called the police, however, and did not go to the designated meeting place.

When they were unable to find Wogomon, the three defendants stopped at a Coastal Mart

for refreshments.  Before going into the store, Ajan told Bowers, who remained in the car with the

three captives, to use the walkie-talkie to tell someone (presumably Simpson in the trail car) to

"shoot the son[s] of [ ] bitches if they move."  JA 593.  When Ajan returned, the group proceeded

to the hotel, where six or seven police cars awaited their arrival.  Ajan reacted by screaming to his

passengers, "She f—ed up now. . . . You're a dead mother f—er."  JA 594.  Rather than stopping

at the hotel, both cars headed out of Kingsport, Tennessee, toward Yuma, Virginia.

After crossing into Virginia, Ajan pulled the car into a Texaco gas station, and Simpson, still trailing in his red car, pulled in behind. Ajan forced White to try to call his mother again but to no avail. Resuming their travels, the group drove farther into Virginia, where they eventually stopped at a secluded spot by a river. The testimony diverges as to what happened next. McDavid testified that one of the defendants placed a gun to his head and threatened to kill him unless he beat up White; McDavid claims that he did beat up White and so was released by the defendants. White and Howe testified, however, that McDavid and White staged the fight as a diversion to allow them to break away. All agree, though, that the three victims eventually freed themselves and made their way to the police.

On the basis of these events, Ajan, Simpson and Bowers were charged in a ten-count indictment, with seven of the counts relating to drug trafficking and three relating to kidnapping.

The jury reached the following verdict. As to count 1, the jury found Ajan (but not the other defendants) guilty of conspiring to distribute more than five grams of methamphetamine. The jury found Simpson and Bowers guilty under count 2 of conspiring to distribute a detectable amount of methamphetamine. The jury found Ajan, the only defendant charged with Count 3, guilty of possession with the intent to distribute more than five grams of methamphetamine, making the lesser included charge in count 4 (possession with the intent to distribute a detectable amount of methamphetamine) irrelevant. As to count 5, which related to the events at the Coastal Mart on November 26, the jury found both Simpson and Bowers not guilty of possessing a firearm in furtherance of a drug trafficking offense. As to Count 6, the jury found Ajan, the only defendant to

which the count applied, guilty of distributing a detectable amount of methamphetamine. Under Count 7, the jury found only Ajan and Simpson guilty of possessing a firearm during a drug trafficking offense (brandishing a weapon on December 8). Turning to the kidnapping charges, the jury found all three defendants not guilty of Count 8 (conspiracy to kidnap), but found all three of them guilty of Count 9 (kidnapping and transporting interstate) and Count 10 (possessing a firearm during a crime of violence, i.e., kidnapping).

The court sentenced Ajan to 646 months of imprisonment, Simpson to 481 months, and Bowers to 211 months.

II.

A.

We first turn to Ajan's and Simpson's challenges to their *consecutive* sentences for multiple convictions of possessing a firearm in violation of 18 U.S.C. § 924(c). As the defendants see it, § 924(c) does not punish the "single use of a single firearm during and in relation to two separate simultaneously committed crimes," Simpson Br. at 29, and to the extent the statute permits consecutive sentences in this setting, it violates the Double Jeopardy Clause. Challenges to the meaning of a statute or to its constitutionality present questions of law, which we review de novo. *Ammex, Inc. v. United States*, 367 F.3d 530, 533 (6th Cir. 2004).

The language of § 924(c) places a considerable hurdle in the path of the defendants' first argument. "[A]ny person," the statute says,

> who, during and in relation to any crime of violence or drug trafficking crime . . . uses or carries a firearm or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime . . . if the firearm is brandished, be sentenced to a term of imprisonment of not less than 7 years.

18 U.S.C. § 924(c). The sweeping language of the statute—applicable to "any person" who "uses . . . a firearm" in connection with "any crime of violence or drug trafficking crime"—offers no foothold for the position that crimes that occur in rapid succession or in the course of one crime spree may not be separately charged. And the statute expressly requires consecutive, not concurrent, sentences when such charges are filed: "no term of imprisonment imposed on a person under this subsection shall run concurrently with any other term of imprisonment imposed on the person, including any term of imprisonment imposed for [the predicate offenses]." 18 U.S.C. § 924(c)(1)(D)(ii).

The defendants' double-jeopardy challenge fares no better. In *United States v. Graham*, 275 F.3d 490 (6th Cir. 2001), as in this case, the defendant argued that his convictions under § 924(c) for carrying a firearm in relation to a drug trafficking crime and for carrying a firearm in relation to a crime of violence violated the Fifth Amendment's Double Jeopardy Clause. *Id.* at 519. Unconvinced, we reasoned that "[w]e have upheld multiple convictions and sentences under 18 U.S.C. § 924(c)(1) so long as such convictions are based on separate predicate acts." *Id.* at 519–20.

Here, Ajan and Simpson committed separate predicate acts (kidnapping and conspiring to distribute methamphetamine), which consisted of distinct elements. To show that they possessed a weapon in furtherance of a drug trafficking offense, for example, the government had to prove that they conspired to distribute methamphetamine; no proof about an agreement to distribute drugs, though, is necessary to prove the other predicate offense, kidnapping. And to show that they possessed a weapon in furtherance of the kidnapping, the government had to prove that they kidnapped and transported individuals in interstate commerce, proof irrelevant to establishing a drug conspiracy. Since each charge required proof of at least one element that the other did not, no double-jeopardy violation occurred. *See Blockburger v. United States*, 284 U.S. 299 (1932).

Ajan and Simpson counter that *United States v. Johnson*, 25 F.3d 1335 (6th Cir. 1994) (en banc), *rev'd on other grounds*, 529 U.S. 53 (2000), not *Graham*, provides the better analogy to this case. In *Johnson*, we concluded that the statute did not permit prosecutors to bring two separate charges (and seek two consecutive sentences) against a defendant who simultaneously possessed one firearm and two types of controlled substances. *Id.* at 1338. Here, in marked contrast, the defendants used a firearm to commit a drug trafficking offense and a crime of violence, two offenses that were separate in time, place and manner. That the crimes occurred during an uninterrupted crime spree does not change matters. Since *Johnson*, we have upheld multiple convictions under the statute where the offenses did not consist of identical conduct, *see Graham*, 275 F.3d at 521, and we have "firmly established that the imposition of separate consecutive sentences for multiple

§ 924(c) violations *occurring during the same criminal episode* [is] lawful." *United States v. Burnette*, 170 F.3d 567, 572 (6th Cir. 1999) (emphasis added).

B.

Bowers separately challenges the admission of a recorded phone call between Simpson (while in jail) and White, claiming that it violated his Sixth Amendment right to confront witnesses against him. In *Bruton v. United States*, 391 U.S. 123 (1968), the Supreme Court held that the admission of a non-testifying codefendant's confession at a joint trial may violate a defendant's confrontation rights even when the jury is instructed to consider the confession only against the codefendant. *Id.* at 137. The *Bruton* rule, the Court has noted, rests on the concern that a codefendant's confession can be so "powerfully incriminating" that jurors may be unable to refrain from attributing it to the defendant as well. *Richardson v. Marsh*, 481 U.S. 200, 207 (1987). *Bruton*'s "narrow exception" to the "almost invariable assumption of the law that jurors follow their instructions," *Marsh*, 481 U.S. at 206–07, however, applies only when a "codefendant's confession 'expressly implicat[es]' the defendant as his accomplice." *Id.* at 208 (quoting *Bruton*, 391 U.S. at 124 n.1); *see also United States v. Sherlin*, 67 F.3d 1208, 1215 (6th Cir. 1995).

None of Simpson's statements in this instance expressly implicates Bowers as an accomplice. Most of the recording consists of Simpson trying to persuade White not to testify at trial. Gov't Ex. 16B (saying, for example, "If you ain't there, they're gonna drop it"); *see also* JA 382–84. Because the district court redacted several statements that might implicate Bowers, the jury heard only two neutral statements obliquely mentioning Bowers (by referring to Bower's lawyer") and one exculpatory reference where Simpson suggested Bowers was not with him at one of the relevant

times. Gov't Ex. 16B. Rather than presenting the type of "powerfully incriminating" testimony that *Bruton* covers, in other words, the one direct mention of Bowers *exculpated* him by suggesting he was not even present.

Bowers responds that Simpson's testimony could be construed to establish that a kidnapping indeed occurred, which undermined the defense's theory that White, McDavid and Howe voluntarily accompanied the defendants to Virginia. In *Marsh*, however, the Court rejected this kind of "contextual implication," 481 U.S. at 209, noting that "the confession was not incriminating on its face, and became so only when linked with evidence introduced later at trial." *Id.* at 208. Similarly, Simpson's suggestion that a kidnapping occurred could not incriminate Bowers until connected with other evidence at trial (such as the testimony of the hostages that Bowers was present and participating). When, as here, a codefendant's statement is "not facially incriminating of [the defendant] and could only have been incriminating when linked with other evidence, [the] redacted statement [does] not pose *Bruton* problems." *Sherlin*, 67 F.3d at 1216. Nor does *Crawford v. Washington*, 124 S. Ct. 1354 (2004), change our analysis. In *Crawford*, the Supreme Court emphasized that "the principal evil at which the Confrontation Clause was directed was the civil-law mode of criminal procedure and particularly its use of *ex parte* examinations as evidence *against the accused*." *Id.* at 1363 (second emphasis added). The Court went on to note that "[t]he text of the Confrontation Clause reflects this focus. It applies to 'witnesses' *against the accused*." *Id.* at 1364 (emphasis added). But here, because the statements exculpated Bowers, rather than incriminated him, they cannot be said to have been used *against* him nor to have prejudiced him.

Bowers also argues that the district court erred in admitting the recorded testimony because it lacked a proper foundation and because it was hearsay. Not so. The court heard testimony from an FBI agent about the detention center's system for recording phone calls and about how he personally copied the tape, which laid an ample foundation for the evidence. At the same time, the testimony was admissible to show spoliation—namely, that Simpson tried to prevent a witness from testifying at trial. *See United States v. Copeland*, 321 F.3d 582, 597 (6th Cir. 2003) (noting that threats against a witness are probative of a defendant's awareness that the government is likely to prevail at trial).

C.

Simpson and Bowers next argue that the district court erred in denying their motions to sever the joint trial. Again, we disagree.

Under the Federal Rules of Criminal Procedure, defendants may be tried together "if they are alleged to have participated in the same act or transaction," Fed. R. Crim. P. 8(b), and indeed "[t]here is a preference in the federal system for joint trials of defendants who are indicted together." *Zafiro v. United States*, 506 U.S. 534, 537 (1993). Once joined, "[s]everance is required 'only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence.'" *United States v. Walls*, 293 F.3d 959, 966 (6th Cir. 2002) (quoting *Zafiro*, 506 U.S. at 539). We review such rulings for an abuse of discretion, *id.* at 966, and only "a strong and compelling showing of prejudice" will lead to a reversal of a joinder ruling, *United States v. Horton*, 847 F.2d 313, 317 (6th Cir. 1988).

Simpson argues that a joint trial is inherently prejudicial and that the drug trafficking and kidnapping charges bore no relationship that would justify a joint trial. But seven of the indicted counts alleged that the defendants participated in the same drug trafficking and kidnapping offenses. And Simpson makes no claim that any of his specific trial rights were prejudiced by the joint trial. Bowers fares no better. Other than reiterating his *Bruton* and *Crawford* argument, he offers no other new explanation why the district court erred in holding one trial for all three defendants. No abuse of discretion occurred.

D.

Simpson and Bowers next contend that the government presented insufficient evidence to support their convictions. This, too, is a difficult argument on appeal.

"Our review of the sufficiency of the evidence is quite limited. We view the evidence in the light most favorable to the government and will affirm the jury's verdict unless no rational trier of fact could have found, beyond a reasonable doubt, that [the defendants] committed the offenses charged." *United States v. Morrow*, 977 F.2d 222, 230 (6th Cir. 1992) (en banc). As the facts laid out above illustrate, the government presented ample evidence in support of each conviction. Even for the weakest count—Bowers' involvement in a conspiracy to sell methamphetamine—a reasonable jury could have found that his overt act of accompanying Ajan and Simpson during the collection of a drug debt at the hotel demonstrated his participation in a conspiracy to distribute methamphetamine. A reasonable jury, in short, had sufficient bases to convict Simpson and Bowers on these counts.

E.

The defendants also raise two challenges to the jury instructions. First, all three defendants argue that the district court twice instructed the jury to apply a preponderance-of-the-evidence standard, which in their view requires a new trial. Because the defendants did not object in either instance, we review for plain error. For an error to be plain, it generally "must have been prejudicial," meaning it "must have affected the outcome of the district court proceedings." *United States v. Olano*, 507 U.S. 725, 734 (1993). And "[i]t is well established that the instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record." *Estelle v. McGuire*, 502 U.S. 62, 72 (1991) (quotation omitted). While all agree that the district court made this error, defendants have not shown that it affected the outcome of the trial. Notably, the record reveals fifteen instances in which the jury was told the correct burden of proof and indeed each of the four attorneys closed their arguments by mentioning the beyond-a-reasonable-doubt standard. Under these circumstances, defendants have failed to provide a plausible reason for concluding that the jury applied the wrong standard.

Second, Bowers independently argues that the district court erred in refusing to give a jury instruction to the effect that statements made by one defendant may not be used against the others. The problem here is that the judge did instruct the jury that it had a "duty to separately consider the evidence against each defendant and return a separate verdict for each one" and emphasized that its "decision as to one defendant should not influence [its] decision as to any other defendant." JA 863; *see also* JA 878 ("You must consider the proof as to each defendant separately."). While this is not

- 12 -

the precise instruction Bowers requested, he has not shown why this instruction did not adequately cover the ground covered by his proposed instruction.

F.

The defendants additionally argue that the Supreme Court's recent decision in *Blakely v. Washington*, 124 S. Ct. 2531 (2004), makes unconstitutional certain increases to their sentences imposed under the federal Sentencing Guidelines. Because our decision in *United States v. Koch*, 383 F.3d 436 (6th Cir. 2004) (en banc), however, held that the Sentencing Guidelines are not invalidated by *Blakely*, we disagree with this conclusion.

G.

Ajan and Bowers also challenge their sentences. "We review a district court's interpretation of a sentencing guideline de novo and 'a court's factual determination of whether a . . . guideline applies in a particular case under a clearly erroneous standard.'" *United States v. Bolka*, 355 F.3d 909, 911 (6th Cir. 2004) (quotation omitted).

Ajan claims that his prior conviction for simple robbery in Louisiana does not qualify as a crime of violence under the U.S. Sentencing Guidelines. But the relevant Guideline defines "crime of violence" to include any offense that "has as an element the use, attempted use, or threatened use of physical force against the person of another." U.S.S.G. § 4B1.2. The Louisiana statute prohibiting simple robbery fits this definition because it includes the "use of force or intimidation" as an element of the crime. La. Rev. Stat. Ann. § 14:65; *see United States v. Martin*, 378 F.3d 578, 581 (6th Cir. 2004) (explaining that this circuit applies a categorical approach to evaluating whether crimes are crimes of violence by looking at the statutory

definition of the predicate offense). On top of this, the commentary to § 4B1.2 specifically lists robbery as a crime of violence. U.S.S.G. § 4B1.2, cmt. n.1.

Bowers challenges two sentencing determinations. His offense level, he argues, should be reduced because he played only a minor or minimal role in the offense, and the court erred in counting a prior conviction for contributing to the delinquency of a minor. He is wrong on both fronts. To qualify as a minor participant, Bowers bears the burden of showing that he is "less culpable than most other participants, but [his] role could not be described as minimal." *Id.* § 3B1.2, cmt. n.5; *see United States v. Salgado*, 250 F.3d 438, 458 (6th Cir. 2001) (noting that the defendant bears the burden of proving that the downward adjustment is warranted). It was not clear error for the judge to conclude that Bowers did not meet his burden of showing a lower level of culpability: Bowers committed an overt act in support of the conspiracy to distribute a detectable amount of methamphetamine by accompanying two armed men to the hotel to collect on a drug debt, leading the way into the room, and assisting in the debt collection by his presence. He offers no explanation, let alone a mitigating explanation, for his presence and involvement. As to the kidnapping, Bowers relayed a threatening message that helped intimidate the hostages into remaining in the car and carried a firearm throughout. Having failed to prove the district court committed clear error in refusing to grant him a two-level downward departure as a minor participant, he even more clearly failed to prove he qualified as a minimal participant deserving of a four-point offense-level reduction. *See* U.S.S.G. § 3B1.2, cmt. n.4 (defining a minimal participant as one who is "plainly among the least culpable of those involved in the conduct of a group").

The district court further erred, Bowers contends, by assessing a criminal history point against him for his prior conviction for contributing to the delinquency of a minor. In support of this argument, he points to § 4A1.2(c)(2) of the Guidelines, which says that "juvenile status offenses and truancy" are never counted as prior sentences for criminal history purposes, then argues that his prior conviction is similar to a juvenile status offense or truancy. Contributing to the delinquency of a minor, however, is not a status offense, for it depends on the status of the victim, not the status of the offender. *See United States v. Ward*, 71 F.3d 262, 263 (7th Cir. 1995)("The "obvious meaning [of 'juvenile status offenses'] is conduct that would be lawful for an adult and is unlawful solely by virtue of *the defendant's* juvenile status.") (emphasis added). Nor was this a truancy offense, as Bowers' conviction had nothing to do with any absence on his part from school.

## H.

Simpson raises one last challenge: he claims that Officer Hickman searched his house on November 26, 2000, without his consent. Because Simpson did not object at trial to the admission of this evidence, we review the issue for plain error. *Olano*, 507 U.S. at 734. "When, as here, it is alleged that the defendant consented to the search, it is the Government's burden, by a preponderance of the evidence, to show through clear and positive testimony that valid consent was obtained." *United States v. Haynes*, 301 F.3d 669, 679 (6th Cir. 2002) (quotation marks and brackets omitted). The government met that burden in this case. At the pre-trial hearing, Officer Hickman presented uncontradicted testimony that, after meeting Simpson at the Coastal Mart on November 26, 2000, he asked Simpson for permission to search Simpson's home, and Simpson

consented. On cross-examination, Officer Hickman reiterated that Simpson consented, testifying that he personally saw Simpson sign a consent form given to him by another officer. The record, in fact, contains no evidence that Simpson did not consent. Even if the search were invalid, moreover, the exclusion of its results would not have changed the outcome of the trial, *see Olano*, 507 U.S. at 734, as the remaining evidence amply demonstrated that Simpson committed the relevant offense, namely that he possessed a firearm on November 26, 2000, in furtherance of a conspiracy to distribute detectable amounts of methamphetamine.

III.

For these reasons, we affirm.