JOURNAL ENTRY AND OPINION
{¶ 1} Defendant Johnny Walker appeals from his conviction of aggravated murder, attempted aggravated murder, and having a weapon while under disability. For the reasons set forth below, we affirm defendant's convictions, vacate his sentence, and remand to the lower court for the limited purpose of re-sentencing.
 {¶ 2} On September 16, 2004, defendant and co-defendant Akanbi Nia were indicted pursuant to a ten-count indictment in connection with the August 26, 2004, shooting of Jessica Weakley, and the attempted killing of Marique Farr. Count One charged defendant with aggravated murder with prior calculation and design, three-year and six-year firearm specifications, felony murder and mass murder specifications.[1] Count Two charged defendant with aggravated murder in the course of aggravated robbery, three-year and six-year firearm specifications, felony murder and mass murder specifications. Counts Three and Four charged defendant with aggravated robbery with three-year and six-year firearm specifications. Counts Five and Six charged defendant with the attempted murder of Farr, with three-year and six-year firearm specifications. Count Eight[2] charged defendant with having a weapon while under disability.[3] Count Nine charged defendant with possession and Count Ten charged him with trafficking in more than twenty-five but less than one hundred grams of crack cocaine, with three-year and six-year firearm specifications.[4] Defendant pled not guilty and the matter proceeded to a joint jury trial on October 5, 2005.
 {¶ 3} The evidence established that Marique Farr was a drug dealer who worked in the area of Superior Hill. Jessica Weakley was his girlfriend. Defendant Nia was holding $26,000 that belonged to Farr, but returned this money to him approximately one week prior to the shooting.
 {¶ 4} On August 26, 2004, Farr's wife Cinnamon rented a car for Farr and he planned to drive to Fort Wayne, Indiana later that night to purchase drugs. Weakley, a senior in high school, told her parents that she was going to a sleep-over, and agreed to accompany Farr as he drove to Indiana.
 {¶ 5} In the afternoon on August 26, 2004, Farr and Weakley prepared for their trip. Farr had a backpack containing $26,000 in the backseat of the car with which he planned to buy a kilo of cocaine. Farr called Nia and arranged to pick up $100 which Nia owed him. Nia asked Farr to pick up defendant, whom he referred to as "Cash." Farr and Weakley picked defendant up in the area of Belmar and Superior, then drove to Nia's house on Coventry. They waited in the driveway for Nia and Nia asked defendant to come up to his apartment. After a few minutes, defendant and Nia got back into the car and Nia gave Farr the money he owed him.
 {¶ 6} Nia then asked Farr to drive him to his aunt's house at Coventry near Superior so that he could pick up his car, a red Chevrolet. Farr drove with Weakley in the front passenger seat, defendant in the rear passenger's side seat, and Nia in the rear driver's side seat. Nia's car was not in the parking lot and Nia made a few phone calls then told Farr to wait. Farr next observed defendant scooting toward Nia. Defendant had a black gun in his hand. Defendant then shot Farr. Weakley screamed, more shots were fired and Weakley slumped forward.
 {¶ 7} Weakley was shot behind her left ear with a 9 millimeter weapon. There was no fouling or stippling at the wound, but it caused a severe brain and brain stem injury which caused death within a few minutes. No gunshot residue was found on the girl. Farr was shot in the head and suffered severe and life threatening injuries to the right side of his brain. He is now blind and paralyzed on his left side.
 {¶ 8} The vehicle was towed to the coroner's office with Weakley's body still inside. Three nine-millimeter shell casings were found in the passenger compartment. Neither a backpack nor money was recovered from the car. A homemade silencer for a weapon was recovered from the front passenger's seat. Gunshot residue was present within this item.
 {¶ 9} Christopher Page, who had been staying at his fiance's apartment on Superior Road, was standing with family members in the parking lot at the back of the building and heard the sound of a car crashing, then heard three or four shots. He observed a male in beige pants and a coat covering his face grab items out of a gray car. He did not know the man's race, but his arm was "light skinned." The man left and Page noticed that two people were in the car. A female occupant appeared dead but the male occupant began coughing up blood. Page's uncle called the police. Police and EMS arrived on the scene at approximately 4:55 p.m. Page subsequently described the man to police as a black male, with a medium complexion, wearing a back basketball jersey with no shirt underneath, and beige pants.
 {¶ 10} Marique Farr was in a coma for several days following the shooting. Although he later regained his ability to speak, he initially responded to his doctor and to the police through finger and hand movements. The police subpoenaed Farr's cell phone records. They presented Farr with the names of various suspects. When asked about Nia, a name provided to East Cleveland Det. Marche by an anonymous tipster, Farr positively responded. Nia was subsequently questioned and told police that he saw Farr and Weakley on the date of the shootings but did not speak to them. Phone records demonstrated, however, that Nia had called Farr six times on the date of the shooting. In a second statement, Nia told Det. Marche that he owed Farr $300 and Farr wanted his money before he left for Indiana later that day. According to Nia's written statement, Farr related that someone named Cee Cee had tried to rob him. The next day, Cee Cee told Nia that he had heard Farr wanted to kill him and he was going to kill Farr before Farr killed him.
 {¶ 11} Nia added:
 {¶ 12} "I was on Union in Cleveland with Johnny selling dope, I had to front one of my young dudes some dope. I was hustling in the area of 71st and Ivey. We were on our way to the hood on East 93rd about to hit Kinsman, Johnny got a call from a crack head named Stacey that lives on Glenmont near Avon Dale that the girl next door something might have happened to her. We didn't think anything about it and thought she was just playing games. I just kept heading to the hood when me and Johnny started getting more and more calls, I got a call from Cuzo and Jay and they told me that Marique and Jessica had been shot. * * *."
 {¶ 13} Nia was jailed in connection with the homicide investigation. He passed a note to a "jail trustee" which indicated in part ""Tell Jay * * * to look under my passenger seat and grab that from the Malibu. Tell Cash they trying to play us, somebody telling them false information about us."
 {¶ 14} Det. Marche noted that a red Malibu had been parked near the crime scene. A for sale sign on the car listed Nia's cell phone number. The department's drug dog alerted at the car and the officers subsequently recovered 70 grams of cocaine from the unlocked car. While they were towing the car, Jemall Simms, aka "Jay" approached and spoke with the officers. The officers subsequently learned that "Cash" is defendant Johnny Walker.
 {¶ 15} Defendant drove past a few minutes later and was arrested. Per department policy, his car was to be towed, and its contents were inventoried. Police found a home made "suppressor" for weapon.
 {¶ 16} Defendant made a statement to police in which he indicated that he had seen Farr and a female on the day of the shooting, and that Nia had repaid Farr the money he owed Farr. He denied shooting Farr and additionally stated that Nia was with him. He acknowledged that the item found behind Weakley's body was a silencer and when asked who else would have a silencer defendant indicated, "just me and Mark [Farr]."
 {¶ 17} The silencer recovered from Farr's rented car and the metal "suppressor" recovered from defendant's trunk were both consistent in terms of the chemical composition of the adhesive portions of the tape. The suppressor had particles indicative of gunshot primer residue and the silencer recovered from the rented car had gunshot residue.
 {¶ 18} Cell phone records demonstrated that defendant called Nia four times on August 26, 2004 and that defendant called Nia daily until August 27, 2004. Farr called defendant eight times on the date of the shooting. Defendant's cell phone was deactivated on September 10, 2004.
 {¶ 19} Nia's cell phone records indicated that he called defendant almost daily in August 2004. On August 26, 2004, Nia called defendant approximately fifteen times, with the last call occurring at 4:56 p.m. Farr called Nia five times on the date of the shooting. Nia called defendant once on the following day but did not call him again for the next four days. Nia's cell phone was deactivated on September 13, 2004.
 {¶ 20} With regard to the calls made on August 26, 2004, defendant called Nia at 4:41 p.m., while both were in East Cleveland. Nia called defendant at 4:51 p.m., while both were in East Cleveland, and Nia attempted to call defendant at 4:56 p.m., while both were in East Cleveland. Both men's cell phones were located in the vicinity of the cell phone tower located at 13800 Terrace Road, which includes the areas of Superior and Coventry Roads.
 {¶ 21} Defendant did not present evidence. The jury found defendant guilty of one count of aggravated murder and one count of attempted aggravated murder, and the trial court found defendant guilty of having a weapon while under disability. Defendant was sentenced to twenty years to life imprisonment on the aggravated murder charge, plus a six-year term for the firearm specification, a consecutive eight-year term on the attempted murder charge, and a concurrent three-year term of imprisonment for having a weapon while under disability.
 {¶ 22} Defendant now appeals and assigns five errors for our review.
 {¶ 23} Defendant's first assignment of error states:
 {¶ 24} "The trial court erred to the appellant's prejudice when it overruled the appellant's motion to suppress."
 {¶ 25} Within this assignment of error, defendant complains that there was no probable cause to arrest him in connection with the shootings of Weakley and Farr. He therefore claims that all evidence seized and all statements taken from defendant should have been suppressed.
 {¶ 26} With regard to our standard of review, we note that an appellate court must accept the trial court's findings of fact if supported by competent, credible evidence. State v. Guysinger (1993),86 Ohio App.3d 592, 594, 621 N.E.2d 726. We are to then independently determine as a matter of law, without deferring to the trial court's conclusions, whether the facts meet the applicable legal standard.State v. Klein (1991), 73 Ohio App.3d 486, 488, 597 N.E.2d 1141.State v. Kobi (1997), 122 Ohio App.3d 160, 168, 701 N.E.2d 420.
 {¶ 27} With regard to the substantive law, we note that "[a]n arrest without a warrant is constitutionally invalid unless the arresting officer had probable cause to make it at that time. To have probable cause, the arresting officer must have sufficient information derived from a reasonably trustworthy source to warrant a prudent man in believing that a felony has been committed and that it has been committed by the accused." State v. Timson (1974), 38 Ohio St.2d 122,311 N.E.2d 16, paragraph one of the syllabus; State v. Kobi, supra, citing Beck v. Ohio (1964), 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142.
 {¶ 28} The assessment of probable cause is based on a review of the "totality-of-the-circumstances," and involve a practical, common sense review of the facts available to the officer at the time. Illinois v.Gates (1983), 462 U.S. 213, 76 L.Ed.2d 527, 103 S.Ct. 2317. This is a practical, nontechnical conception that deals with probabilities and not certainties. Id., 462 U.S. at 231. The Gates Court acknowledged that informant's tips, like all other clues and evidence coming to a policeman on the scene, may vary greatly in their value and reliability. The court abandoned the rigid application of "veracity" or "reliability" and "basis of knowledge" found in Aguilar v. Texas (1964), 378 U.S. 108,12 L.Ed. 2d 723, 84 S.Ct. 1509 and Spinelli v. United States (1969),393 U.S. 410, 21 L. Ed.2d 637, 89 S.Ct. 584, and noted that these are issues that may usefully illuminate the commonsense, practical question whether there is "probable cause" to believe that contraband or evidence is located in a particular place. The Court noted that an officer may rely upon information received through an informant, rather than upon his direct observations, so long as the informant's statement is reasonably corroborated by other matters within the officer's knowledge. Id. The Court stated:
 {¶ 29} "While a conscientious assessment of the basis for crediting such tips is required by the Fourth Amendment, a standard that leaves virtually no place for anonymous citizen informants is not." Id., U.S. at 238.
 {¶ 30} In this matter, the supplemental transcript of the suppression hearing indicates that Det. Marche spoke to Farr's wife, Cinnamon, then spoke to Dwight Whiteside to learn the names of Farr's associates. Whiteside indicated that "Kombi" and "Boo" were possible suspects. Using the super name search feature of the LEADS data terminal, Det. Marche then determined that "Kombi" was defendant Akanbi Nia. Farr's wife then told police that Nia was her husband's friend.
 {¶ 31} On September 8, 2004, Det. Marche received an anonymous phone call identifying "Kombi" and "Cash" as the assailants. The caller claimed that Farr had $60,000 and a kilo of cocaine at the time of the shooting and that the attack was a "robbery that went bad." The caller also instructed the police to check Farr's cell phone records.
 {¶ 32} Although Farr could not speak, Cinnamon Farr named possible suspects. Farr did not respond to some of the names, but he squeezed her hand when she said Nia's name.
 {¶ 33} Nia subsequently made a statement to police in which he indicated that he saw Farr and Weakley on the date of the shootings but did not speak to them. Det. Marche obtained Nia's cell phone number and learned, however, that Nia had called Farr six times on the date of the shooting. Det. Marche mirandized him and Nia later stated that he owed Farr $300 and Farr wanted his money before he left for Indiana later that day. Nia was later held in connection with the homicide investigation.
 {¶ 34} Nia then passed a note to an incarcerated trustee named Daniel Wilson, which indicated in part ""Tell Jay * * * to look under my passenger seat and grab that from the Malibu. Tell Cash they trying to play us, somebody telling them false information about us."
 {¶ 35} The detective recalled that there was a red Malibu parked near the crime scene . They noted that a for sale sign on the car had Nia's cell phone number. The department's drug dog alerted at the car and the officers subsequently recovered 70 grams of cocaine from the unlocked car. While they were towing the car, Jemall Simms, aka "Jay" approached and asked what the officers were doing. At this time, they learned from Simms that "Cash" was defendant Johnny Walker. One of the detectives knew defendant Walker and observed him drive past a few minutes later. He was arrested, and per department policy, his car was towed. At this time, they found a homemade suppressor for weapon. Defendant Walker was mirandized and made a statement and Nia also made another statement to police after Miranda warnings were again given to him.
 {¶ 36} From the foregoing, we agree with the trial court's conclusion that the totality of the circumstances indicate that the arrest was supported by probable cause. The investigating officers received information that "Kombi" and "Cash" were the assailants and that it was a robbery that went bad. Later, Cinnamon Farr indicated that Farr had indicated that Nia was involved. Nia then wrote a note that implicated "Cash" and noted that something had to be taken out of his Malibu. As the officers searched the car, defendant drove by and was identified as "Cash." The totality of the circumstances clearly established probable cause, though various clues linking the crime to Nia, and then to defendant. Although an anonymous tip was provided and this implicated "Cash," this information was subsequently corroborated by Nia's note which indicated in relevant part, "Tell Cash they trying to play us, somebody telling them false information about us."
 {¶ 37} Moreover, the subsequent search of defendant's car, including the trunk, was also proper as police are permitted to conduct inventory searches of vehicles for a limited purpose, such as where, by policy, they are to catalogue the contents of an impounded vehicle. SeeSouth Dakota v. Opperman (1976), 428 U.S. 364, 376, 96 S.Ct. 3092, 3100,49 L.Ed.2d 1000; State v. Mesa, 87 Ohio St.3d 105, 108-109,1999-Ohio-253, 717 N.E.2d 329, 332, 333. See, also, State v. Poole, Cuyahoga App. No. 80250, 2002-Ohio-5326 ( officer's inventory search of vehicle including the trunk and suitcases was proper where car was to be towed); State v. Bridges, Cuyahoga App. No. 80171, 2002-Ohio-3771 (same); State v. Kerr, Wood App. No. WD-05-080, 2006-Ohio-6058; In such instances, contraband may be immediately seized. State v. Schultz, Lake App. No. 2003-L-156, 2005-Ohio-345.
 {¶ 38} In accordance with the foregoing, we note that the evidence established that it is a policy of the East Cleveland Police Department to conduct an inventory search where an arrestee's car is to be impounded. The trial court properly concluded that the police were therefore permitted to conduct an inventory search of the car, including the trunk, and the trial court did not err in refusing to suppress admission of the homemade silencer found at this time.This assignment of error is without merit.
 {¶ 39} Defendant's second assignment of error states:
 {¶ 40} "Appellant's Sixth Amendment right to confront witnesses against him was violated when police officers were permitted to present hearsay statements made by the co-defendant."
 {¶ 41} Within this assignment of error, defendant complains that the trial court erred in allowing the introduction of co-defendant's Nia's statements to police since Nia was not determined to be unavailable and was not subject to cross-examination.
 {¶ 42} The Sixth Amendment's Confrontation Clause provides that, "in all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him."
 {¶ 43} In general, the Confrontation Clause of the Sixth Amendment prohibits the admission of extrajudicial statements of a non-testifying co-defendant which inculpate the accused. See State v. Moritz (1980),63 Ohio St.2d 150, 407 N.E.2d 1268, paragraph one of the syllabus, following Bruton v. United States (1968), 391 U.S. 123, 88 S.Ct. 1620,20 L.Ed.2d 476. In Bruton, supra, the United States Supreme Court held that the admission of a non-testifying co-defendant's confession, which clearly implicated another defendant at a joint trial, was a violation of that defendant's rights under the Confrontation Clause, and noted that the non-testifying co-defendant's confession "added substantial, perhaps even critical, weight to the Government's case in a form not subject to cross-examination, since [the co-defendant] did not take the stand." Id. at 128. The rationale was that a co-defendant's confession that implicates another defendant is both "devastating to the defendant" and inherently untrustworthy "given the recognized motivation to shift blame onto others." Id. at 136. Accord State v. Hubbard, Cuyahoga App. No. 83384, 2004-Ohio-4627; State v. Parker (1991), 72 Ohio App.3d 456,594 N.E.2d 1033.
 {¶ 44} The recent Supreme Court decision in Crawford v.Washington (2004), 541 U.S. 36, 158 L.Ed.2d 177, 124 S.Ct. 1354 does not alter our conclusion. In Crawford, the Supreme Court emphasized that "the principal evil at which the Confrontation Clause was directed was the civil-law mode of criminal procedure and particularly its use of ex parte examinations as evidence against the accused." Id. at 1363 (second emphasis added). Moreover, in United States v. Simpson (C.A. 6, 2004), 116 Fed. Appx. 736, vacated as to sentence United States v. Simpson
(2005), 543 U.S. 1182, 125 S.Ct. 1418, 161 L.Ed. 2d 180, the Court held that statements which exculpated the defendant, rather than incriminated him, were not admitted in violation of the Confrontation Clause. The Court stated:
 {¶ 45} "Nor does Crawford v. Washington, 541 U.S. 36, 158 L.Ed.2d 177,124 S. Ct. 1354 (2004), change our analysis. In Crawford, the Supreme Court emphasized that "the principal evil at which the Confrontation Clause was directed was the civil-law mode of criminal procedure and particularly its use of ex parte examinations as evidence against the accused." Id. at 1363 (second emphasis added). The Court went on to note that "the text of the Confrontation Clause reflects this focus. It applies to witnesses against the accused." Id. at 1364 (emphasis added). But here, because the statements exculpated Bowers, rather than incriminated him, they cannot be said to have been used against him nor to have prejudiced him."
 {¶ 46} Crawford made explicit that "the Clause does not bar the use and admission of out-of-court testimonial statements for purposes other than establishing the truth of the matter asserted." Id., 541 U.S. at 59
n. 9. This is consistent with the general rule that when an out-of-court statement is not offered to prove the truth of the matter asserted, the Confrontation Clause is not implicated. Tennessee v. Street (1985),471 U.S. 409, 413, 85 L.Ed.2d 425, 105 S. Ct. 2078; United States v.Sexton (2005), 119 Fed. Appx. 735.
 {¶ 47} In this matter, however, Nia's statements to police did not implicate either co-defendant as Nia first stated that on August 23, 2004, he had observed Farr and others selling drugs. According to Nia's written statement, Farr related that someone named Cee Cee had tried to rob him. The next day, Cee Cee told Nia that he had heard Farr wanted to kill him and he was going to kill Farr before Farr killed him.
 {¶ 48} Nia added:
 {¶ 49} "I was on Union in Cleveland with Johnny selling dope, I had to front one of my young dudes some dope. I was hustling in the area of 71st and Ivey. We were on our way to the hood on East 93rd about to hit Kinsman, Johnny got a call from a crack head named Stacey that lives on Glenmont near Avon Dale that the girl next door something might have happened to her. We didn't think anything about it and thought she was just playing games. I just kept heading to the hood when me and Johnny started getting more and more calls, I got a call from Cuzo and Jay and they told me that Marique and Jessica had been shot. * * *."
 {¶ 50} We conclude that the introduction of this evidence did not constitute a Bruton violation as Nia's statement did not implicate defendant. Similarly, introduction of this evidence did not violate the Confrontation Clause as it was not inculpatory of defendant and was not used for the truth of the matter asserted.
 {¶ 51} With regard to Nia's additional statement to police:
 {¶ 52} "That is a home-made silencer that belongs to Marique Farr that I saw him and Johnny Walker make in the white van," we have already determined that the trial court did not err in refusing to suppress the homemade silencer found in defendant's car. In addition, in his own statement to police defendant admitted that he had a "dummy silencer for a handgun." We find no prejudicial error in connection with this statement.
 {¶ 53} This assignment of error is without merit.
 {¶ 54} Defendant's third assignment of error states:
 {¶ 55} "The convictions for aggravated murder and attempted aggravated murder were against the manifest weight of the evidence."
 {¶ 56} When assessing whether a conviction is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and ultimately determine "whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Thompkins,78 Ohio St.3d 380, 386, 1997-Ohio-52, 678 N.E.2d 541; Id., quoting State v.Martin (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717.
 {¶ 57} An appellate court should reserve reversal of a conviction as being against the manifest weight of the evidence for only the most "exceptional case in which the evidence weighs heavily against the conviction." Id.
 {¶ 58} In this matter, we cannot conclude that the convictions are against the manifest weight of the evidence. The Cell phone evidence demonstrated that defendant and Nia had numerous conversations prior to the shootings, and placed them in the area of the shooting. The note written by Nia contains a warning for "Cash" and instructions regarding potential evidence. Farr testified that defendant was in the rear seat, that he saw defendant with a black gun, and that defendant shot him then shot Weakley, killing her. Farr further testified that he had a bag containing $26,000 in the car. Page saw a man removing something from the car and no money was recovered during the investigation. Defendant presented no independent evidence. From the foregoing evidence and all reasonable inferences, the jury did not lose its way and create such a manifest miscarriage of justice by finding defendant guilty of the offenses.
 {¶ 59} This assignment of error is without merit.
 {¶ 60} Defendant's fourth assignment of error states:
 {¶ 61} "The evidence was insufficient to support convictions for aggravated murder and attempted aggravated murder."
 {¶ 62} "Sufficiency of the evidence" is "'a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law.'" State v. Thompkins,78 Ohio St.3d 380, 386, 1997-Ohio-52, 678 N.E.2d 541, quoting Black's Law Dictionary (6th Ed. 1990) 1433. The relevant inquiry when determining whether the evidence is sufficient to support the verdict "is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." State v. Jenks (1991),61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus.
 {¶ 63} The state's evidence demonstrated that defendant and Nia called one another a number of times prior to the shooting. Farr was in possession of $26,000 of cash. The defendants asked Farr to drive them to an out of the way location. Farr observed defendant with a black gun in his hand. According to Farr, defendant shot him and then shot Weakley who died at the scene. A homemade silencer was found near her body. Christopher Page observed a man removing items from the car shortly after he heard gunshots. Phone records link defendant to Farr and Nia and Nia's note warns "Cash." Later, another homemade silencer was found in the trunk of his car. Viewing this evidence most favorable to the prosecution, any rational trier of fact could have found the essential elements of aggravated murder, attempted murder and having a weapon while under disability were established beyond a reasonable doubt.
 {¶ 64} Defendant's fifth assignment of error states:
 {¶ 65} "The trial court erred by sentencing appellant to consecutive sentences."
 {¶ 66} Defendant next complains that the trial court did not engage in the analysis required pursuant to R.C. 2929.14(E), before imposing consecutive sentences.
 {¶ 67} In State v. Foster, 109 Ohio St.3d 1, 2006-Ohio-856,845 N.E.2d 470, the Supreme Court of Ohio applied the principles announced inBlakely v. Washington (2004), 542 U.S. 296, 124 S.Ct. 2531,159 L.Ed.2d 403 to Ohio's felony sentencing statutes. The Court held that various statutes violate the constitutional right to a jury trial as they require judicial factfinding before imposition of sentence. In particular, the Court held that R.C. 2929.14(E)(4), which provides that consecutive sentences may not be imposed except after additional factfinding by the judge increases the total punishment only after judicial findings beyond those determined by a jury or stipulated to by a defendant does not comply with Blakely. The Court then severed this provision, along with others,[5] from the sentencing scheme and held that judicial factfinding is no longer required before the imposition of consecutive prison terms or maximum terms.
 {¶ 68} The Foster Court additionally held that where the defendant's sentence is based upon an unconstitutional statute and such case is pending on direct review, the sentence is deemed void and the ordinary course is to vacate that sentence and remand to the trial court for a new sentencing hearing. On remand, the trial court is vested with discretion to impose such term. In this connection, the trial court must "carefully consider the statutes that apply to every felony case [including] R.C. 2929.11, which specifies the purposes of sentencing, and R.C. 2929.12, which provides guidance in considering factors relating to the seriousness of the offense and recidivism of the offender [and] statutes that are specific to the case itself."
 {¶ 69} Later, in State v. Mathis, 109 Ohio St. 3d 54, 2006 Ohio 855,846 N.E.2d 1, paragraph 3 of the syllabus, the court further explained the resentencing procedure. The Mathis Court held that the trial court is to conduct the sentencing hearing de novo and "in exercising its discretion the court must carefully consider the statutes that apply to every felony case. Those include R.C. 2929.11, which specifies the purposes of sentencing, and R.C. 2929.12, which provides guidance in considering factors relating to the seriousness of the offense and recidivism of the offender. In addition, the sentencing court must be guided by statutes that are specific to the case itself."
 {¶ 70} Defendant contends that Foster violates his rights against ex post facto legislation. This issue is not ripe for review because appellant has yet to be re-sentenced under Foster. See State v.Erwin, Cuyahoga App. No. 87333, 2006 Ohio 4498; State v. McCarroll, Cuyahoga App. No. 86901, 2006-Ohio-3010; State v. Chambers, Cuyahoga App. No. 87221, 2006-Ohio-4889; State v. Rady, Lake App. No. 2006-L-012,2006-Ohio-3434; State v. Pitts, Allen App. No. 01-06-02, 2006-Ohio-2796;State v. Sanchez, Defiance App. No. 4-05-47, 2006-Ohio-2141. Accordingly, this argument is without merit.
 {¶ 71} In accordance with the foregoing, defendant's sentence must be vacated and the matter must be remanded for re-sentencing.
 {¶ 72} Defendant's convictions are affirmed, his sentences are vacated, and the matter is remanded for re-sentencing.
It is ordered that appellee and appellant split the costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
JAMES J. SWEENEY, P.J., and CHRISTINE T. MCMONAGLE, J., CONCUR
[1] These specifications were later dismissed from Count One and Count Two by the State of Ohio.
[2] Count Seven charged defendant Nia with having a weapon while under disability.
[3] This count was tried to the Court.
[4] The state subsequently dismissed Counts Nine and Ten.
[5] The Foster Court held that the following statutory sections are unconstitutional: R.C. 2929.14(B), (C), (D)(2)(b), (D)(3)(b), and (E)(4); R.C. 2929.19(B)(2); and R.C. 2929.41(A).